Law Offices
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York  10178
Tel.: (212) 309-6000
Fax: (212) 309-6001
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | |
|---|---|
| JOSEPH ROSE, individually and on behalf of all other persons similarly situated, : | |
| : | |
| Plaintiffs, : | Civil Action No.: 14-CV-3569 |
| : | |
| v. : | **ELECTRONICALLY FILED** |
| : | |
| NORTHWESTERN MUTUAL LIFE : | **ORAL ARGUMENT** |
| INSURANCE COMPANY, NORTHWESTERN : | **REQUESTED** |
| MUTUAL INVESTMENT SERVICES LLC, : | |
| and any related entities, : | |
| : | |
| Defendants. : | |

-----------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**
**ON THE CLAIMS OF PLAINTIFF JOSEPH ROSE**

**MORGAN, LEWIS & BOCKIUS LLP**
Christopher A. Parlo
101 Park Avenue
New York, New York  10178
(212) 309-6000
(212) 309-6001 (facsimile)

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ..................................................................1

II.     SUMMARY OF UNDISPUTED FACTS ...................................................3

     A.     Background Information Regarding Northwestern Mutual and General Agents. ...........................................................................................3

     B.     Rose Voluntarily Entered Into A Contract As A Commissioned, Independent Contractor Insurance Agent to Sell Northwestern Mutual Products. .............................................................................................5

     C.     Rose Controlled The Manner and Means By Which He Sold Life Insurance Products. ...........................................................................7

     D.     Northwestern Mutual Had No Involvement In The Seery Agency's Program ..............................................................................................9

     E.     Rose Was Paid Only By Commission And Only By The Seery Agency. ............11

     F.     Rose Determined Which Days And Hours He Worked. ......................................11

     G.     Rose Was Free To Engage In Other Work During The Term Of His Contract. .............................................................................................12

     H.     Rose Received No Benefits From Northwestern Mutual. ...................................13

III.    ARGUMENT ............................................................................................13

     A.     Rose Was An Independent Contractor, And Not An Employee. .........................13

          1.     Undisputed Facts Establish That Northwestern Mutual Did Not Exercise The Degree of Control Over Rose Necessary To Establish An Employer-Employee Relationship Under the NYLL. ......................14

     B.     In the Alternative, Even If Rose Is Deemed An "Employee" of Northwestern Mutual – Which He is Not – His Claims Still Fail Because He Is Exempt Under The New York Labor Law Outside Salesperson Exemption. ..........................................................................................18

          1.     Outside Salespersons Are Exempt Under New York Law. .....................18

          2.     Courts and the DOL Have Repeatedly Held That Insurance Agents, Like Rose, Are Outside Salespeople. ......................................21

          3.     Uncontroverted Facts Establish That Rose's Primary Duty Was the Sale of Life Insurance and That He Was Customarily and Regularly Engaged Away From The Office To Do So. ..........................23

IV.     CONCLUSION ........................................................................................25

## TABLE OF AUTHORITIES

Page(s)

CASES

*Ackerman v. Coca-Cola Enter., Inc.*,
   179 F.3d 1260 (10th Cir. 1999) ........................................................................ 18

*Akgul v. Prime Time Transp., Inc.*,
   741 N.Y.S.2d 553 (App. Div. 2002) .................................................................. 13

*Armacida v. D.G. Neary Realty Ltd.*,
   65 A.D.3d 984 (1st Dep't 2009) ........................................................................ 13

*Barnhart v. N.Y. Life Ins. Co.*,
   141 F.3d 1310 (9th Cir. 1998) ........................................................................... 17

*Bearden v. AAA Club South, Inc.*,
   No. 11-0314, 2013 WL 1181474 (W.D. Tenn. Mar. 18, 2013) .......................... 20

*Billingslea v. Brayson Homes, Inc.*,
   No. 04-00962, 2007 WL 2118990 (N.D. Ga. July 20, 2007) ............................ 21

*Bogan v. Northwestern Mut. Life Ins. Co.*,
   606 N.Y.S.2d 775 (2d Dep't 1994) .................................................................... 17

*Bouder v. Prudential Fin., Inc.*,
   No. 06-4359, 2010 WL 3515567 (D.N.J. Aug. 31, 2010) ............................ 22, 24

*Bynog v. Cipriani Grp., Inc.*,
   1 N.Y.3d 193 (N.Y. 2003) ................................................................................. 13

*Chaouni v. Ali*,
   105 A.D.3d 424 (1st Dep't 2013) ...................................................................... 14

*Chenensky v. New York Life Ins. Co.*,
   No. 07-11504, 2009 WL 4975237 (S.D.N.Y. Dec. 22, 2009), *motion for
   reconsideration denied*, 2010 WL 2710586 (S.D.N.Y. June 24, 2010) ............. 21, 22, 24

*Christopher v. SmithKline Beecham Corp.*,
   132 S.Ct. 2156 (2012) ....................................................................................... 19

*Christopher v. SmithKline Beecham Corp.*,
   No. 08-1498, 2009 WL 4051075 (D. Ariz. Nov. 20, 2009), *aff'd sub nom,* 635
   F.3d 383 (9th Cir. 2011), *aff'd*, 132 S. Ct. 2157 (2012) ................................... 22

*Chuchuca v. Chuchuca*,
   67 A.D.3d 948 (2d Dep't 2009) ......................................................................... 14

*Gold v. New York Life Ins. Co.*,
    730 F.3d 137 (2d Cir. 2013) ........................................................................21, 24

*Hartman v. Prospect Mortg., LLC*,
    11 F. Supp. 3d 597, 604 (E.D. Va. 2014) .......................................................19, 20

*Hennighan v. Insphere Ins. Solutions, Inc.*,
    38 F. Supp. 3d 1083, 1107 (N.D. Cal. 2014) .......................................................17

*Holden v. Northwestern Mut. Financial Network*,
    No. 07-0930, 2009 WL 440937 (E.D. Wis. Feb. 23, 2009) .............................17, 24

*Kemberling v. MetLife Life & Annuity Co. of Conn.*,
    368 F. App'x 63 (11th Cir. 2010) ........................................................................15

*Lint v. Northwestern Mut. Life Ins. Co.*,
    No. 09-1373, 2010 WL 4809604 (S.D. Cal. Nov. 19, 2010).....................19, 21, 24

*Lipnicki v. Meritage Homes Corp.*,
    No. 10-605, 2014 WL 923524 (S.D. Tex. Feb. 13, 2014).....................................20

*Misewicz v. City of Memphis, Tenn.*,
    771 F.3d 332 (6th Cir. 2014) ...............................................................................6

*Murray v. Principal Fin. Grp., Inc.*,
    613 F.3d 943 (9th Cir. 2010) .............................................................................17

*Nixon v. Northwestern Mut. Life Ins. Co.*,
    58 F. Supp. 2d 1269 (D. Kan. 1999) ..................................................................17

*Olivo v. GMAC Mortg. Corp.*,
    374 F. Supp. 2d 545 (E.D. Mich. 2004) .............................................................19

*Pierce v. Northwestern Mutual Life Ins. Co.*,
    444 F. Supp. 1098 (D.S.C. 1978) ..................................................................16, 17

*Reiseck v. Univ. Commc'ns. of Miami, Inc.*,
    591 F.3d 101 (2d Cir. 2010) ..............................................................................18

*Sanabria v. Aguero-Borges*,
    117 A.D.3d 1024 (2d Dep't 2014)......................................................................14

*Schmidt v. Eagle Waste & Recycling, Inc.*,
    599 F.3d 626 (7th Cir. 2010) .............................................................................19

*Shaw v. Am. Income Life Ins. Co.*,
    No. 11-123, 2012 WL 400703 (N.D. Ind. Feb. 7, 2012).....................................15

*Sofranko v. Northwestern Mut. Life Ins. Co.*,
    No. 06-1657, 2008 WL 145509 (W.D. Pa. Jan. 14, 2008) .......................3, 4, 15, 17

iii

*Taylor v. Waddell & Reed, Inc.*,
No. 09-2909, 2012 WL 10669 (S.D. Cal. Jan. 3, 2012) .............................................20, 22, 23

*Tracy v. NVR, Inc.*,
293 F.R.D. 395 (W.D.N.Y. 2013) ....................................................................................... 20

*Velu v. Velocity Express, Inc.*,
666 F. Supp. 2d 300 (E.D.N.Y. 2009) ................................................................................. 13

*Weary v. Cochran & Northwestern Mut. Life Ins. Co.*,
377 F.3d 522 (6th Cir. 2004) ............................................................................................. 16

*Wortham v. Am. Fam. Ins. Grp.*,
385 F.3d 1139 (8th Cir. 2004) ........................................................................................... 17

*Zipser v. Ewing*,
197 F. 2d 728 (2d Cir. 1952) ............................................................................................. 17

STATUTES

ADEA ................................................................................................................................ 17

FLSA ....................................................................................................................6, 17, 18, 19

FLSA 2009-28 ....................................................................................................................... 24

N.Y. LAB. LAW §§ 650, *et seq.* .............................................................................................. 13

N.Y. LAB. LAW § 651(d) ...................................................................................................... 18

OTHER AUTHORITIES

29 C.F.R. § 541.500(a) ......................................................................................................... 18

29 C.F.R. § 541.500(b) ......................................................................................................... 18

29 C.F.R. §§ 541.500(b) and 541.701 .................................................................................. 20

29 C.F.R. §541.503(a) ...................................................................................................... 19, 20

29 C.F.R. § 785.27, 29 C.F.R. § 785.32 ................................................................................. 6

69 Fed. Reg. at 22,187 (Apr. 23, 2004) ................................................................................ 20

DOL Opinion Letter FLSA 2006-11, 2006 WL 1094597 (Mar. 31, 2006) .................................. 19

DOL Opinion Letter FLSA 2007-2, 2007 WL 506575 (Jan. 25, 2007) ................................. 19, 20

DOL Opinion Letter FLSA 2009-28, 2009 WL 649036 (Jan. 6, 2009) .................................... 22

## I.  PRELIMINARY STATEMENT

Defendants (collectively, "Northwestern Mutual" or the "Company") submit this Memorandum of Law in support of their Renewed Motion for Summary Judgment ("Motion") on the claims of Plaintiff Joseph Rose ("Plaintiff" or "Rose").  The main question before the Court remains whether, under the New York Labor Law, Rose was an "employee" of Northwestern Mutual for a five month period in 2010 during which he was party to a contract that authorized him to sell Northwestern Mutual insurance products for a commission on his sales.  Because the uncontroverted facts establish that Rose was not an employee of Northwestern Mutual (the only defendant in the case), and, instead, that he was an independent contractor, he is not entitled to any minimum wage, overtime payment, or other relief. Moreover, even if Rose were found to be an employee of Northwestern Mutual (which he is not), the undisputed facts show that he was also an outside salesperson and, therefore, exempt from the coverage of the law on that basis as well.

Under New York law, an employer-employee relationship exists when the putative employer exerts a sufficient degree of control over an individual.  Such control can be demonstrated through factors such as whether the individual worked at his or her own convenience, was free to engage in other employment, received fringe benefits, was on the employer's payroll, was on a fixed schedule, and had an independent contractor relationship memorialized in a written agreement.  As explained more fully below, none of these factors falls in Rose's favor.

Rose's entire connection to Northwestern Mutual was that he had signed a contract that authorized him, as an independent contractor, to sell its products.  His contract was not with Northwestern Mutual; it was with Krystin Boylan, herself an independent contractor within an independent general agency owned and operated by Rob Seery and the Seery Financial Group

(the "Seery Agency").  Rose's contract with Boylan expressly states, and numerous other documents confirmed, that he was an independent contractor, and not an employee of either Boylan, Seery or Northwestern Mutual.  Indeed, Rose has conceded in his sworn deposition that he *knew he was an independent contractor* during the time he was contracted to sell Northwestern Mutual products.[1]

As an independent contractor college agent, Rose endeavored to create an insurance business of his own.  To do so, Rose himself chose the markets and centers of influence (i.e. groups of people from his personal life) to whom he thought he could sell insurance.  Rose selected his own clients and decided whether, how, when and where he would reach out to them to try to make sales.  Rose set his own schedule and individual sales strategy.  He recommended certain products based on his own independent analysis of his prospective clients' financial needs.  Northwestern Mutual had literally no input into, and therefore exercised no control over, how Rose did this, or otherwise conducted his business.  Indeed, during his time as a college agent, Rose never individually met with, nor received any guidance, supervision, or performance evaluations from, anyone at Northwestern Mutual.

Rose was also free to conduct any other businesses he wanted and he did so during the time he was an agent.  Rose received no hourly wage, no salary, nor any benefits from Northwestern Mutual.  Instead, like most independent insurance agents, Rose was compensated by commission for any sales of Northwestern Mutual insurance products, and was paid those commissions by the Seery Agency.

While Plaintiff claimed to need additional discovery because he did not know he had to establish control by the only defendant in the case, not a single fact has emerged, in the extra

---

[1] Rose never objected to the terms of his contract, or voiced any concern about his status as an independent contractor until four years after his contract was terminated when he filed his Complaint, alleging for the first time that he was an employee of Northwestern Mutual.

year Plaintiff was granted by the Court, to support such a finding.[2]  To the contrary, the

supplemental discovery confirmed that college agent programs, including the one in which Rose

participated, are established and operated exclusively by the independent General Agencies that

choose to implement such programs.  Northwestern Mutual has no input into how the various

General Agencies operate their respective programs, as evidenced by the fact that there was

virtually no contact between Northwestern Mutual's personnel in Milwaukee and the program in

which Rose participated.

After now two rounds of discovery it remains undisputed as a matter of fact and law that

Northwestern Mutual had absolutely no involvement in, nor any direction or control over, any of

Rose's sales efforts.  Accordingly, as numerous other federal courts have concluded with respect

to agents selling Northwestern Mutual products (*see infra* pp. 17-18), Rose was an independent

contractor and Defendants are entitled to a summary judgment in their favor.

## II.   SUMMARY OF UNDISPUTED FACTS[3]

### A.   Background Information Regarding Northwestern Mutual and General Agents.

Northwestern Mutual is a life insurance company headquartered in Milwaukee,

Wisconsin.  56.1 Stmt. ¶ 3; *Sofranko v. Northwestern Mut. Life Ins. Co.*, No. 06-1657, 2008 WL

---

[2] After briefing was completed on Defendants' original April 6, 2015 Motion for Summary Judgment (*see* Dkt. Nos. 20-24), the Court ordered supplemental discovery on one discrete issue: Rose's relationship, if any, with entities or individuals *other than* Robert Seery and Krystin Boylan (née Fischer), and the extent to which any such entities or individuals exerted any control over Rose during his affiliation with Northwestern Mutual.  The Court further ordered that Defendants could refile their original Motion with any supplemental evidence or legal argument at the conclusion of supplemental discovery, which ended in June 2016.

[3] The full set of undisputed facts in support of this Motion is set forth in Defendant's Local Rule 56.1 Statement of Undisputed Facts ("56.1 Stmt.").  For the Court's convenience, a summary of the facts is set forth below.  Relevant pages of the deposition transcripts of Rose ("Rose Tr."), Robert Seery ("Seery Tr."), Krystin Boylan (née Fischer) ("Boylan Tr."), and Michael Van Grinsven ("Van Grinsven Tr.") are attached to the Affidavit of Christopher A. Parlo ("Parlo Aff.") as Exs. 1-4 filed herewith.

3

145509, at *3 (W.D. Pa. Jan. 14, 2008) (holding an agent with a contract to sell Northwestern

Mutual products to be an independent contractor).  Its core business is underwriting, issuing, and

servicing insurance policies (life, disability income, and long-term care) and annuities.[4]  56.1

Stmt. ¶ 1.  Northwestern Mutual does <u>not</u> directly solicit prospective customers to apply for or

purchase its insurance products.  56.1 Stmt. ¶ 4.  It does <u>not</u> hire any employees to sell its

products, and it does not sell insurance from its headquarters in Wisconsin or through direct

marketing, bank affiliations, or the internet.  56.1 Stmt. ¶¶ 5-6.  Instead, for over 100 years,

Northwestern Mutual has sold its products only through a network of independent insurance

agents, who, like Rose, individually contract with separate "General Agents" to sell those

products.  56.1 Stmt. ¶ 7.  Those agents have continuously been found by the courts to be

independent contractors.  *See* pp. 17-18*, infra.*

General Agents, who are themselves independent contractors, contract with  independent

sales agents who sell Northwestern Mutual insurance products to the public.  56.1 Stmt. ¶ 8.

Northwestern Mutual enters into contracts directly with General Agents located throughout the

United States.  *Sofranko*, 2008 WL 145509 at *3.  In short, General Agents contract for the right

to solicit applications from customers for Northwestern Mutual products within a given territory

and to sell them insurance. 56.1 Stmt. ¶ 9.  General Agents, in turn, may contract with "District

Agents" and/or "Field Directors" to grow their own  agencies.  56.1 Stmt. ¶ 10.  District Agents

and Field Directors are also not employees of Northwestern Mutual.  56.1 Stmt. ¶ 11.  Instead,

they are licensed insurance agents who run their own insurance businesses.  *Id.*  District Agents

---

[4] Northwestern Mutual Investment Services, LLC ("NMIS") is a subsidiary of Northwestern
Mutual Life Insurance Company that provides brokerage and advisory services to individuals
and businesses as to securities and other registered products.  56.1 Stmt. ¶ 2.  At no point in time
did Rose obtain the necessary securities licenses to sell these types of products, and Rose
therefore testified that he could not think of any possible connection between him and NMIS.
56.1 Stmt. ¶ 26 ("I didn't even know that [NMIS] existed").  For that reason alone, summary
judgment should be granted to NMIS on Rose's claims.

4

and Field Directors, in turn, may contract directly with Financial Representatives or "College Agents" ("FRs" or "Agents") like Rose.  56.1 Stmt. ¶ 12.  The contracts that FRs sign with General Agents, District Agents, or Field Directors  expressly provide that FRs are independent contractors and not employees.  56.1 Stmt. ¶ 13.

**B.      Rose Voluntarily Entered Into A Contract As A Commissioned, Independent Contractor Insurance Agent to Sell Northwestern Mutual Products.**

Under state insurance laws, no individual can sell insurance without being both licensed by a state and appointed by an insurance company to do so.  56.1 Stmt. ¶ 14.  This is not the exertion of control by any company, but an externally driven industry/legal requirement.  *See* n. 6, *infra*.

After studying for and obtaining his state insurance license, Rose was appointed in June 2010 to sell life insurance, long term care insurance, and other products of Northwestern Mutual.  56.1 Stmt. ¶ 15.  In order to sell these products, Rose voluntarily entered into a "College Student Agent's Contract" (the "Contract") with Krystin Boylan (née Fischer) ("Boylan"), a College Unit Director ("CUD") in New York City.  56.1 Stmt. ¶ 16; Parlo Aff. Ex. 5.  The Contract was thereafter endorsed by Robert Seery ("Seery"), a General Agent in White Plains, New York, who owned the Seery Agency.  56.1 Stmt. ¶ 17.  On its very first page, the Contract expressly stated the parties' understanding that Rose was an independent contractor and not an employee of Northwestern Mutual, Seery or Boylan.  Parlo Aff. Ex. 5, ¶ 4 ("Agent shall be an independent contractor and nothing herein shall be construed to make Agent an employee of the Company, General Agent, or First Party.").  Similarly, in Rose's Contract application he confirmed that he understood that "as a Northwestern Mutual Financial Representative you will be an independent contractor and not an employee of either the Company, General Agent, District Agent, Field Director, College Unit Director or the First Party to your agent's contract."  56.1 Stmt. ¶ 23;

Parlo Aff. Ex. 6.  Rose testified that he knew he was an independent contractor.[5]  56.1 Stmt. ¶ 24.

Both Rose's Contract and application further provided that he would be compensated solely by

commission paid by the Seery Agency, and he testified that he understood that he would be paid

by commission only, instead of receiving an hourly wage or salary.  56.1 Stmt. ¶ 36;  Parlo Aff.

Exs. 5 and 6.  Northwestern Mutual did not keep track of the commissions Rose was paid

through his sales and does not do so as a matter of course.  56.1 Stmt. ¶ 39.

    In June 2010 Rose attended a training session in White Plains, New York for

approximately three weeks.[6]  After completing this training, he was able to try to sell products

out of the New York City office of, and later the Poughkeepsie office of, the Seery Agency.  56.1

Stmt. ¶ 28.  Rose ended his relationship with Boylan and Seery in October 2010 by executing

another contract, *i.e.*, a "Mutual Agreement of Contract Termination."  56.1 Stmt. ¶ 26; Parlo

Aff. Ex. 7.  Accordingly, Rose's affiliation with the Company was, at all times, governed by a

written contract expressly indicating that he was an independent contractor.  No one at

Northwestern Mutual ever told him that he was an employee of the Company.  56.1 Stmt. ¶ 18.

_____

[5] Rose previously entered into an independent contractor arrangement with Belltower Books
("Belltower"), a textbook resale company, prior to his Contract with Boylan.  56.1 Stmt. ¶ 25.
As with his General Agent, Rose knew at the time he contracted with Belltower, to work as a
"buyer" and then later as a "campus captain," that he was an independent contractor, not an
employee.  *Id.*; Rose Tr. 61:4-8.  Rose was also paid by commission based on the number of
books he was able to resell for Belltower.  56.1 Stmt. ¶ 25.  Rose had also worked for Amway as
an "independent business owner."  56.1 Stmt. ¶ 26.  Rose thus clearly understood what an
independent contractor was.

[6] Even the training course Rose attended, which provided him with information regarding the
insurance licensing exam, was taught by an independent, third-party agency not affiliated with
Northwestern Mutual.  56.1 Stmt. ¶ 27.  Moreover, training to take an insurance or securities
exam is not tied specifically to Northwestern, but is a task Plaintiff needed to complete to sell the
products of any insurance company.  Accordingly, that study time is not compensable work.  *See*
29 C.F.R. § 785.27, 29 C.F.R. § 785.32; DOL WAGE-HOUR, 1997 WL 998038 (Sept. 15, 1997
Op. Letter) (time spent by insurance agents training and studying for state-mandated insurance
exams not compensable time under FLSA).  *See also Misewicz v. City of Memphis, Tenn.*, 771
F.3d 332, 339 (6th Cir. 2014) (firefighters' time spent training for state-mandated certifications
not compensable under FLSA).

**C.    Rose Controlled The Manner and Means By Which He Sold Life Insurance Products.**

Rose himself – not anyone from Northwestern Mutual – exercised complete control over the manner and means by which he sold insurance products.  For example, Rose was not given a single lead or prospect to contact to sell insurance by Northwestern Mutual.  56.1 Stmt. ¶ 40. Instead, Rose was able to determine, entirely on his own, the "centers of influence" and markets through which he thought he could build his client base to sell insurance.  Specifically, through his own contacts, and those of his family and friends, Rose created his own "web" of "warm markets," with whom he thought he would have the most success in selling insurance products. 56.1 Stmt. ¶ 41; Rose Tr. 230:15-23 (Q: "And you picked those to contact?"  A: "Yes."); 293:21-23 (A:  "Yeah, they would give me sheets, blank sheets of paper, webs, and be like, go figure out your market.").  Rose then independently chose the individuals from whom he thought he could seek additional client referrals.  56.1 Stmt. ¶ 42; Rose Tr. 303:12-15 (Q: "And no one from Mr. Seery's agency or from Northwestern Mutual told you that you had to pick these people?"  A: "No.  I picked them myself.").

Rose created his own marketing plan, encompassing his entire individualized sales strategy.  It included: (i) which markets he would target; (ii) what tools and strategies he would use to sell insurance products to individuals in these markets; (iii) his own personal sales goals; and (iv) how many policies he would have to sell to pay for his annual expenses.  56.1 Stmt. ¶ 43; Seery Tr. 114:17-115:14 (explaining that FRs are provided with a "tremendous amount of freedom and leeway" on how they choose to build their insurance businesses); Parlo Aff. Ex. 8. Rose set all his own goals.  Rose Tr. 313:15-19 (Q: "Does that also refresh your recollection that you set up all the goals you had?" A:  "Yes, it is evident.").  Northwestern Mutual had no role in any part of this process.

After choosing his markets and strategy, Rose determined how many calls he would make each day to prospective clients, and which individuals he called, in order to build his own book of business.  56.1 Stmt. ¶ 45.  No one from Northwestern Mutual monitored the number of calls Rose made each day, nor did Rose always record the number himself.  56.1 Stmt. ¶ 46.  No one from Northwestern Mutual gave him any leads or clients:

> Q:   And when you were in that office, you picked who to call based upon the list that you were finding either online or that you used from the day before?
>
> A:   Yes, I had the freedom to pick the list and call whoever I want.
>
> Q:   And no one gave you any leads?
>
> A:   No one gave me any leads.

*Id.*  Often, he just went to Google to find lists of "people, law firms," and would just start cold calling.  56.1 Stmt. ¶ 48.  Nobody approved or vetted who he called, checked if he actually made calls, checked if he totally fabricated the number of calls (which Rose admitted he did), or watched over his shoulder.  56.1 Stmt. ¶ 49.  In short, Rose had complete discretion over who he chose to solicit and when, where, and how to do so.  Northwestern Mutual had no involvement, direction or control over this process.

Aside from making calls, Rose sought out referrals through social media, such as Facebook – a strategy he came up with by himself.  56.1 Stmt. ¶ 47.  Rose also set up appointments with prospective clients and traveled to their homes and offices to meet them.  56.1 Stmt. ¶ 50.  At client appointments, Rose would analyze the prospective clients' financial needs by soliciting information from them in an effort to match them with a suitable policy.  56.1 Stmt. ¶ 51.  Rose did this entirely on his own; only when he was about to "close" a policy did he seek optional assistance from a more senior independent agent.  56.1 Stmt. ¶ 52.

Rose was never penalized or disciplined for failing to make a certain number of calls or for failing to set up a certain number of client appointments, or for any other aspect of his performance or strategy.  56.1 Stmt. ¶ 53.  Although Rose met occasionally with Boylan to

discuss his sales strategy and goals generally – these were goals Rose set for <u>himself</u> and Boylan

focused only on the results of his efforts, not on the manner or means of how Rose sought to get

there.  There were also no requirements on how much insurance Rose was expected to sell.  56.1

Stmt. ¶ 54; Rose Tr. 332:7-11 (Q: "And at no point in time did anyone say to you have to

achieve a minimum level of sales or production to keep a contract.  Did they?"  A: "No.").  No

one from Northwestern Mutual communicated any goals or expectations to Rose, provided him

with materials, or even communicated with him.  56.1 Stmt. ¶ 55.  Indeed, Rose's Contract

expressly precludes any such control stating, "Agent shall be free to exercise his own judgment

as to the persons from whom he will solicit Applications and the time, place and manner of

solicitation . . . ."  56.1 Stmt. ¶ 56; Parlo Aff. Ex. 5.

Rose never received a single performance evaluation, feedback  or any other type of

critique of his performance as an insurance agent, and Northwestern Mutual does not create or

maintain personnel files for any FR, including Rose.  56.1 Stmt. ¶¶ 57-58; Seery Tr. 123:21-25.

Tellingly, Rose admitted that he did exactly the same tasks as full-time insurance agents,

who, as noted below (pp. 17-18, *infra*), have repeatedly been found by the courts to be

independent contractors and not employees. 56.1 Stmt. ¶ 59; Rose Tr. 107:10-21 (Q: "But as far

as you know there was nothing you were doing differently than what they do?" A: "Yeah, I don't

think there is anything that much different.").

**D.** **Northwestern Mutual Had No Involvement In The Seery Agency's Program.**

The parties' supplemental discovery confirmed that Northwestern Mutual had a

completely "hands off" approach with respect to the college agent programs operating around the

country, including the Seery program in which Rose participated.

According to Mr. Van Grinsven, Northwestern Mutual's Internship Director for the past

ten years, General Agencies like the Seery Agency, are fully responsible for recruiting their own

insurance agents and for promoting their college agent programs at any number of college campuses, job fairs, or other locations.  56.1 Stmt. ¶ 79.  Northwestern Mutual has no part in this process.  In fact, for students who express an interest in participating in a college agent program Northwestern Mutual often encourages them to contact the General Agencies for more information, not Northwestern Mutual itself.  56.1 Stmt. ¶ 80.  Moreover, Northwestern Mutual is often entirely unaware of what promotional materials are distributed or posted regarding these programs, because General Agencies are free to create and distribute any number of brochures or handouts without approval from Northwestern Mutual.  56.1 Stmt. ¶ 83.  Indeed, the Seery Agency created multiple such publications to advertise its own college agent program, and decided on its own which events to attend to recruit talent.  *See* Parlo Aff. Ex. 10.

Additionally, General Agencies have complete autonomy over the development and operation of their college agent programs (if they choose to implement one at all).  56.1 Stmt. ¶ 83.  Northwestern Mutual does not send them any information about how the program should be run or the types or extent of training agents should undergo.  56.1 Stmt. ¶ 84.  There are no annual goals, sales quotas or client lead requirements that agencies or college agents are expected to meet.  56.1 Stmt. ¶ 86.  In fact, there is virtually no contact between Northwestern Mutual and the General Agents or CUDs who run the programs.  56.1 Stmt. ¶ 78.  Northwestern Mutual does not even keep track of the number of college interns any agency has or the sales that they generate.  56.1 Stmt. ¶ 87.  The result is that each college agent program is different and operates completely independently of Northwestern Mutual.

In short, the undisputed facts show that at no point did Northwestern Mutual exercise any control over Rose at all, much less the level of control needed to create an employer-employee relationship.  Northwestern Mutual did **not**: (1) recruit or hire Rose; (2) assign Rose tasks; (3) schedule or monitor his hours; (4) supervise or monitor Rose's performance; (5) require Rose to

attend meetings; (6) conduct performance reviews; (7) pay Rose's commissions; (8) discipline

Rose; (9) have the authority to promote, transfer, or demote Rose; or (10) fire Rose.  Simply,

there exists no indicia of control by Northwestern Mutual.

**E.    Rose Was Paid Only By Commission And Only By The Seery Agency.**

 Rose was not paid hourly or any salary.  Instead, Rose was paid only on a commission

basis, receiving a percentage of the first-year premium paid by customers for the insurance

product(s) he sold to them.[7]  These commissions were paid by the Seery Agency, not by

Northwestern Mutual, an arrangement Rose understood and acknowledged.  56.1 Stmt. ¶ 35.  If

Rose did not make any sales he received no commission.  56.1 Stmt. ¶ 37.  Because Rose

testified he had no minimum sales requirement, the amount of money he made (or did not make)

in commissions was solely within his own control.  56.1 Stmt. ¶ 60.

**F.    Rose Determined Which Days And Hours He Worked.**

 Throughout his time as an Agent, including when he returned to college in the fall of

2010, Rose was free to – and did – set his own schedule for when, where, and to whom he sold

insurance policies without anyone closely monitoring what he was doing.  In Rose's own words,

his schedule was "very flexible."  56.1 Stmt. ¶ 61.  Rose never had to "punch-in" or "punch-out"

of a time clock, and instead could decide on his own when to arrive at and leave the office.  *Id*.

Rose was not required to report what days or hours he worked in any given week, and no one

tracked Rose's attendance or hours, either at the Seery Agency or at Northwestern Mutual.  Rose

Tr. 236:20-23 (Q: "And you weren't reporting and no one was tracking your hours.  Correct?"

A: "No, no one was tracking, no reporting.").   Rose freely took days off, including vacation,

---

[7] Rose did, in fact, make two sales of insurance policies during the five months he was an Agent
and, pursuant to his Contract, was paid a commission on both of those sales by the Seery
Agency.  56.1 Stmt. ¶¶ 33, 34; Parlo Aff. Ex. 9.

sick days, and bereavement days whenever he wanted, and without being disciplined or penalized.  56.1 Stmt. ¶ 66.

Rose scheduled his own appointments for when and where to make sales, and he met customers outside of the office when convenient for his schedule.  56.1 Stmt. ¶ 68.  For instance, Rose testified that he met prospective clients at their homes and offices and that, especially when having to travel  to other parts of New York, appointments sometimes took multiple hours.  56.1 Stmt. ¶ 69.  Neither Rose nor anyone else affiliated with Northwestern Mutual recorded how many hours Rose spent soliciting clients or selling insurance policies.  56.1 Stmt. ¶ 70.

G.     **Rose Was Free To Engage In Other Work During The Term Of His Contract.**

As independent contractors, and subject to any securities and other regulatory requirements, individuals with contracts to sell Northwestern Mutual products, such as Rose, may engage in other work or sales activities with other companies, including competing insurance companies.  56.1 Stmt. ¶ 71.  Consistent with this understanding, no one at Northwestern Mutual ever advised Rose that he was prohibited from engaging in other work or sales activities – and he took full advantage of this freedom.  56.1 Stmt. ¶ 72.  Specifically, during the fall of 2010 Rose also worked as an independent contractor for Belltower, a book seller.  56.1 Stmt. ¶ 73.  With Belltower he supervised 8 to 10 buyers and oversaw cash flow of tens of thousands of dollars.  Rose Tr. 56.1 Stmt. ¶ 74; Rose Tr. 58:22-59:3 ($63,000 in one semester).  In October 2010, Rose decided to terminate his Contract to sell insurance and focus exclusively on Belltower – work he described as "easy" compared to selling insurance products.  56.1 Stmt. ¶ 75.  The fact that Rose was free to engage in a second business at the same time he was selling insurance products should be conclusive evidence of his independent contractor status.

**H.**     **Rose Received No Benefits From Northwestern Mutual.**

Given his independent contractor status, Rose was neither entitled to, nor received, any

benefits such as health or disability insurance, and he did not participate in any retirement plan

from the Company.  56.1 Stmt. ¶ 76.  Northwestern Mutual made no contributions to workers'

compensation insurance, unemployment insurance, or Social Security for Rose.  56.1 Stmt. ¶ 77.

## III.     ARGUMENT

As the record reflects, there is no genuine issue of material fact as to the question of

whether Rose is an employee or an independent contractor and, therefore, Defendants' motion

for summary judgment should be granted in its entirety.

**A.**     **Rose Was An Independent Contractor, And Not An Employee.**

Under the NYLL and its regulations, employers must pay their employees at least the

minimum wage for hours worked, and overtime wages for any hours worked in excess of forty

(40) in any given workweek.  N.Y. LAB. LAW §§ 650, *et seq.*; N.Y. Comp. Codes R. § Regs. tit.

12, §142-2.2.  The NYLL defines "employee" as "any person employed for hire by an employer

in any employment."  *Id.* at § 190(2).  The statute excludes independent contractors from this

definition, and courts use New York's common law test to decide whether someone is an

employee or an independent contractor.  *See Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193 (N.Y.

2003); *Akgul v. Prime Time Transp., Inc.*, 741 N.Y.S.2d 553, 556 (App. Div. 2002).  New York

law specifically focuses on the degree of control exercised by the purported employer over the

"results produced or the means used to achieve the results."  *Velu v. Velocity Express, Inc.*, 666

F. Supp. 2d 300, 306 (E.D.N.Y. 2009) (citing *Bynog*, 1 N.Y. 3d at 198).  Factors relevant to

assessing control include whether the worker "(1) worked at his own convenience, (2) was free

to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll

and (5) was on a fixed schedule."  *Bynog*, 1 N.Y. 3d at 198-99; *see also Armacida v. D.G. Neary

Realty Ltd.*, 65 A.D.3d 984 (1st Dep't 2009) (real estate broker who was "permitted to work

13

whatever hours he chose, [] did not report to or receive directions from anyone at the brokerage, [] was provided with no health insurance benefits and [] was [directly] compensated strictly on the basis of commissions" was an independent contractor and not an employee); *Chaouni v. Ali*, 105 A.D.3d 424, 425 (1st Dep't 2013) (driver who had "unfettered discretion to determine the days and times [he] worked" was an independent contractor).

A putative employer's exercise of "incidental control" or "general supervisory control" over an individual is insufficient to create an employer-employee relationship. *See Chuchuca v. Chuchuca*, 67 A.D.3d 948, 949 (2d Dep't 2009); *Chaouni*, 105 A.D.3d at 425. Further, while not dispositive, the "existence of a contract designating a person as an independent contractor . . . is a factor to be considered." *Sanabria v. Aguero-Borges*, 117 A.D.3d 1024, 1026 (2d Dep't 2014).

## 1. Undisputed Facts Establish That Northwestern Mutual Did Not Exercise The Degree of Control Over Rose Necessary To Establish An Employer-Employee Relationship Under the NYLL.

Every factor relevant in assessing whether Northwestern Mutual exercised the degree of control over Rose necessary to establish an employee-employer relationship conclusively demonstrates that Rose was an independent contractor, and not an "employee," under the NYLL.

### a. Rose Testified That He Worked At His Own Convenience And Not On A Fixed Schedule.

Rose testified that he decided whether and when to work, what days to take off,  how long to work, and whether, when and where to schedule his client appointments.  He was not required to clock in, and no one at Northwestern Mutual tracked his hours.  56.1 Stmt. ¶ 61.

Further, Rose could not even reconstruct at his deposition – even generally – the number of hours and days he worked.  56.1 Stmt. ¶ 63; Rose Tr. 99:2-19 (Q: "Can you tell me how many hours that week, if any, you spent trying to sell Northwestern Mutual products?" A: "Well, I can't put hours on it….").  Any calendar Rose had he "threw away," thus destroying any

14

evidence.  56.1 Stmt. ¶ 64.  Rose was also able to be away from his office as needed – and did so

freely (spending 14 days away in just the first three months).  56.1 Stmt. ¶ 66.  When he returned

to school in Fall 2010, he spent progressively fewer hours each week trying to sell insurance, and

then spent no time at all.  56.1 Stmt. ¶ 67; Rose Tr. 118:6-14 ("… [Northwestern Mutual] wasn't

a full time thing at that point.").  Thus, the record demonstrates that the first factor weighs in

Northwestern Mutual's favor.

> ### b.   Rose Was Free To Engage In Other "Employment" While Under Contract With Northwestern Mutual.

Rose was never advised that he could not provide services to or accept employment with

another company while simultaneously selling Northwestern Mutual's insurance products.  56.1

Stmt. ¶ 72.  Accordingly, Rose did so.  During the fall of 2010, while he still had a contract to

sell insurance products, he also provided services as an independent contractor for Belltower.

56.1 Stmt. ¶ 73.  Once Rose determined that he no longer wanted to pursue a career as an

insurance agent with the Company, he voluntarily terminated his Contract to sell insurance and

focused all his energy on Belltower's business.  56.1 Stmt. ¶ 75; Parlo Aff. Ex. 7.  All of this was

his choice and, thus, the second factor also weighs in favor of Northwestern Mutual.[8]

---

[8] Courts have also noted that, under the contract Rose signed, agents can even simultaneously
sell the products of other competing insurance companies. *See e.g.*, *Sofranko*, 2008 WL 145509,
at *4 (Northwestern Mutual did not exert "significant control" over insurance agent where the
"contract provided that the plaintiff could sell insurance products of other insurance companies if
[Northwestern Mutual] did not offer the product desired…."); *Kemberling v. MetLife Life &
Annuity Co. of Conn.*, 368 F. App'x 63, 67 (11th Cir. 2010) (evidence that plaintiff was "not
bound by contract to work for or solicit insurance for MetLife only" indicated that he was an
independent contractor of MetLife); *Shaw v. Am. Income Life Ins. Co.*, No. 11-123, 2012 WL
400703, at *8 (N.D. Ind. Feb. 7, 2012) ("[A]n employer's control over an alleged employee is
further deteriorated when the agreement is non-exclusive, allowing the agent to sell other
companies' products.").

  c.  **Rose Did Not Receive Any Fringe Benefits From Northwestern Mutual.**

It is undisputed that Rose received *no* fringe benefits from either Northwestern Mutual, Boylan or Seery. Rose did not receive any type of insurance, unemployment or workers' compensation benefits, nor was he eligible to participate in Northwestern Mutual's retirement plans. 56.1 Stmt. ¶¶ 76, 77. This third factor indisputably weighs in favor of Northwestern Mutual.

  d.  **Rose Was Not On Northwestern Mutual's Payroll.**

Rose was paid only by commission and no one from Northwestern Mutual promised him any guaranteed compensation. 56.1 Stmt. ¶ 32. Rose received no salary, he received no wage statements of any kind from Northwestern Mutual, and Northwestern Mutual never withheld any taxes or other payments from Rose's compensation. *Id.* Rose did receive two commission payments – the entire and only payments owed to him under his Contract –both of which were paid by the Seery Agency, not by Northwestern Mutual. 56.1 Stmt. ¶¶ 32, 34. Because Rose was *not* on Northwestern Mutual's payroll, this factor clearly weighs in favor of Defendants.

  e.  **Rose Voluntarily Signed A Contract Designating Him As An Independent Contractor.**

Rose's Contract as well as his Contract application clearly stated that his relationship was one of independent contractor, not employee. 56.1 Stmt. ¶ 23; Parlo Aff. Ex. 5. Further, Rose testified that he understood himself to be an independent contractor and that the tasks he performed in trying to sell insurance was similar to other insurance agents. 56.1 Stmt. ¶¶ 24, 59. All of the foregoing facts support the conclusion that Rose was not an employee of Northwestern Mutual.

This conclusion is in line with decisions from numerous other federal and state courts which have held that other Northwestern Mutual agents with contracts substantively identical to Rose's are independent contractors and not employees. *See, e.g.*, *Weary v. Cochran &*

*Northwestern Mut. Life Ins. Co.*, 377 F.3d 522, 523 (6th Cir. 2004) ("[T]his Court has repeatedly held that insurance agents are independent contractors, rather than employees, in a variety of contexts.") (affirming lower court's grant of summary judgment for Northwestern Mutual because the insurance agent was an independent contractor); *Holden v. Northwestern Mut. Financial Network*, No. 07-0930, 2009 WL 440937, at *7 (E.D. Wis. Feb. 23, 2009) (granting Northwestern Mutual's summary judgment motion because the insurance agent was an independent contractor); *Sofranko*, 2008 WL 145509 (granting Northwestern Mutual's motion for summary judgment on the insurance agent's FLSA claims because the agent was an independent contractor); *Nixon v. Northwestern Mut. Life Ins. Co.*, 58 F. Supp. 2d 1269, 1273 (D. Kan. 1999) (dismissing claims based on independent contractor relationship); *Bogan v. Northwestern Mut. Life Ins. Co.*, 606 N.Y.S.2d 775, 776 (2d Dep't 1994) (granting summary judgment because of independent contractor status of general agents); *Pierce v. Northwestern Mutual Life Ins. Co.*, 444 F. Supp. 1098, 1104-05 (D.S.C. 1978) (granting summary judgment and confirming independent contractor status of general and District Agents).[9]  As Rose was an independent contractor during his affiliation with Northwestern Mutual, he was not eligible for minimum wage and overtime payments under the NYLL.  Accordingly, his claims must be dismissed in their entirety with prejudice.

---

[9] The insurance agents of other companies have also regularly been found to be independent contractors.  *See, e.g., Zipser v. Ewing*, 197 F. 2d 728, 728 (2d Cir. 1952) (agent was an independent contractor where "[t]he company did not, and under the agreement, could not have required the agent to work full time for it, canvass any particular territory, or, with any particular frequency, contact any particular prospect, use any particular sales technique, require regular reports, confine himself to selling a particular amount or kind of policy. ") (citing to case law and Northwestern Mutual as an example); *Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943, 944-45 (9th Cir. 2010) ("We, along with virtually every other Circuit to consider similar issues, have held that insurance agents are independent contractors and not employees for purposes of various federal employment statutes [including the ADEA].");  *Wortham v. Am. Fam. Ins. Grp.*, 385 F.3d 1139, 1140-41 (8th Cir. 2004) (insurance agent was independent contractor as a matter of law); *Barnhart v. N.Y. Life Ins. Co.*, 141 F.3d 1310, 1313 (9th Cir. 1998) (insurance agent was an independent contractor); *Hennighan v. Insphere Ins. Solutions, Inc.*, 38 F. Supp. 3d 1083, 1107 (N.D. Cal. 2014) (insurance agent was an independent contractor).

**B.**     **In the Alternative, Even If Rose Is Deemed An "Employee" of Northwestern Mutual – Which He is Not – His Claims Still Fail Because He Is Exempt Under The New York Labor Law Outside Salesperson Exemption.**

**1.**     **Outside Salespersons Are Exempt Under New York Law.**

The NYLL expressly excludes "outside salespersons" from the minimum wage and overtime requirements.  N.Y. LAB. LAW § 651(d).  An outside salesperson is "an individual who is customarily and predominantly engaged away from the premises of the employer and not at any fixed site and location for the purpose of: (i) making sales; (ii) selling and delivering articles or goods; or (iii) obtaining orders or contracts for services or for the use of facilities." N.Y.C.R.R. § 142-2.16(c)(5).

To determine whether an employee is properly classified as an outside salesperson, New York courts follow the federal test under the FLSA.  *See Reiseck v. Univ. Commc'ns. of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010) ("The NYLL, too, mandates overtime pay and applies the same exemptions as the FLSA.").  The DOL Regulations promulgated under the FLSA define "outside salesman" as any employee: (1)  whose primary duty is: (i) making sales within the meaning of section 3(k) of the [FLSA], or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.  29 C.F.R. § 541.500(a).

Exempt sales work includes all "work performed incidental to and in conjunction with the employee's own outside sales or solicitations," regardless of where it is performed.  29 C.F.R. § 541.500(b).  For example, work such as "attending sales conferences," preparing paperwork related to the employees sales, and promotional activities directed toward the consummation of the employee's own sales or solicitations is also considered exempt work.  *Id.* §§ 541.500(b), 541.503(b).  *See, e.g., Ackerman v. Coca-Cola Enter., Inc.*, 179 F.3d 1260, 1266

(10th Cir. 1999) (concluding that work salesmen performed in support of their sales was

incidental to those sales and that plaintiffs were therefore exempt from the FLSA); *Olivo v.*

*GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 550 (E.D. Mich. 2004) (concluding that time

plaintiffs spent at the office, including "following up on contacts and leads generated during

outside sales visits," was incidental to plaintiffs' outside sales efforts).

Promotion work done to bolster one's own sales or solicitations also qualifies as exempt

sales work. *Christopher v. SmithKline Beecham Corp.*, 132 S.Ct. 2156, 2162-63 (2012) (citing

29 C.F.R. §541.503(a)). Moreover, promotional work qualifies as outside sales work

"irrespective if the efforts result in actual sales." *Hartman v. Prospect Mortg., LLC*, 11 F. Supp.

3d 597, 604 (E.D. Va. 2014) ("promotional work is exempt if it is in conjunction with outside

sales *or* solicitations, the latter being applicable here") (emphasis original) (citations omitted).

Meeting potential customers, attending or putting on events intended to drum up leads

and sales, assessing the competition, and any number of other promotional and sales-related

activities all qualify as "making sales" for purposes of the exemption. *See Schmidt v. Eagle*

*Waste & Recycling, Inc.*, 599 F.3d 626, 631 (7th Cir. 2010) (promotional work outside the office

constituted exempt outside sales work where it was incidental to the employee's own sales); *Lint*

*v. Northwestern Mut. Life Ins. Co.*, No. 09-1373, 2010 WL 4809604, at *3 (S.D. Cal. Nov. 19,

2010) (insurance salesman was exempt where he spent time outside the office at meetings of

targeted organizations and dropped in on small business owners to generate business); DOL

Opinion Letter FLSA 2007-2, 2007 WL 506575, at *2-5 (Jan. 25, 2007) ("Opinion Letter 2007-

2") (leaving the office to conduct certain activities constituted outside sales activity even if the

"sale" was consummated at the employer's office); DOL Opinion Letter FLSA 2006-11, 2006

WL 1094597, at *3 (Mar. 31, 2006) (test of being "'engaged away from the employer's place of

business' depends on the extent to which they engage in sales *or solicitations, or related*

19

*activities*, outside of the employer's place or places of business") (emphasis added).  Indeed, any activity that furthers an individual's own sales efforts and takes place outside the office satisfies the second element of the exemption test.  29 C.F.R. § 541.503(a).

The requirement that the outside salesperson must be "customarily and regularly engaged away from the employer's place or places of business" means a "frequency that must be greater than occasional but which, of course, may be less than constant."  29 C.F.R. §§ 541.500(b) and 541.701.  In the seminal Opinion Letter on the number of hours necessary to meet the exemption, the DOL concluded that "one or two hours a day, one or two times a week" satisfies the test.  Opinion Letter 2007-2, 2007 WL 506575 at *3.  This "two to four hours" standard is fully consistent with the position the DOL took in explaining the current version of its Regulations, stating:  "Nothing in this section requires that, to meet the definition of 'customarily and regularly,' a task be performed more than once a week or that a task be performed each and every workweek."  69 Fed. Reg. at 22,187 (Apr. 23, 2004).

The Federal courts have consistently recognized with approval and applied Opinion Letter 2007-2's statement of the amount of time sufficient to constitute "customarily and regularly."  *See*, *e.g.*, *Taylor v. Waddell & Reed, Inc.*, No. 09-2909, 2012 WL 10669, at *3 (S.D. Cal. Jan. 3, 2012) (granting defendant summary judgment and recognizing that "[t]he DOL likewise confirmed that selling or sales related activity outside the office ***"one or two hours a day, one or two times a week"*** satisfies the test for the exemption") (emphasis in original).[10]  In

---

[10] *See also Lipnicki v. Meritage Homes Corp.*, No. 10-605, 2014 WL 923524, at *7 (S.D. Tex. Feb. 13, 2014) (deferring to Opinion Letter 2007-2's interpretation of "customarily and regularly" as "one or two hours a day, one or two times a week"); *Hartman*, 11 F. Supp. 3d at 603 (granting employer summary judgment on outside sales exemption and stating that "'customarily and regularly' is not a majority of the time test . . . The DOL has likewise confirmed that selling or sales related activity outside the office 'one or two hours a day, one or two times a week' satisfies the test for the exemption."); *Tracy v. NVR, Inc.*, 293 F.R.D. 395, 399 (W.D.N.Y. 2013) (citing Opinion Letter 2007-2 for the DOL's standard of 1-2 hours per day, twice a week); *Bearden v. AAA Club South, Inc.*, 11-0314, 2013 WL 1181474 at *7 (W.D. Tenn.

20

short, spending "one or two hours a day one or two times a week" away from the employer's place of business satisfies the second requirement of the outside sales exemption.

### 2. Courts and the DOL Have Repeatedly Held That Insurance Agents, Like Rose, Are Outside Salespeople.

Every federal court to address whether insurance agents like Rose are exempt outside salespersons has, without exception, found that the exemption applies, including as to agents with contracts to sell Northwestern Mutual products. *Lint*, 2010 WL 4809604, at *3 (holding insurance salesman exempt under outside sales exemption). In *Lint*, the court focused on the facts that, like the Plaintiff here, the insurance agent signed a contract saying he was a sales agent, described his job as insurance sales, received training in sales, was paid only a commission for sales, and had minimum selling standards.

The Second Circuit has also affirmed summary judgment for an insurance company, holding that its insurance agent was exempt as an outside salesperson, where, as with Rose, he: (1) was hired and trained to sell insurance; (2) his compensation was commission-based; (3) he was responsible for maintaining his own client lists; and (4) his responsibilities were to "go out, meet people" and "close deals." *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 145 (2d Cir. 2013). The Southern District of New York similarly granted summary judgment to New York Life, holding that its former insurance agent was an exempt outside salesperson. *See Chenensky v. New York Life Ins. Co.*, No. 07-11504, 2009 WL 4975237, at *7 (S.D.N.Y. Dec. 22, 2009), *motion for reconsideration denied*, 2010 WL 2710586 (S.D.N.Y. June 24, 2010). The court concluded that the insurance agent's primary duty, as with Rose, was "plainly" sales, including work "incidental to consummating the deal." *Id*. at *6. Moreover, the court found that the insurance agent's argument was undermined by his commission-based compensation, under

Mar. 18, 2013) (citing with approval the DOL's position in Opinion Letter 2007-2); *Billingslea v. Brayson Homes, Inc.*, No. 04-00962, 2007 WL 2118990, at *4 (N.D. Ga. July 20, 2007) (holding that "The DOL's interpretation of § 541.500 is reasonable, and should be applied . . .").

which, as here, he got paid only if a sale were made. *Id.* Most importantly, the court in *Chenensky* also found that, like Rose, the insurance agent's attending outside functions to "troll" for business, managing his appointment calendar, working the hours he chose, and exercising significant overall discretion over the content and structure of his work life, demonstrated sufficient time outside the office to satisfy the second requirement of the exemption (time outside the office). *Id*.

Agreeing with the *Chenensky* decision, the District of New Jersey also granted summary judgment to an insurance company, holding that insurance agents are exempt outside salespersons. *See Bouder v. Prudential Fin., Inc.*, No. 06-4359, 2010 WL 3515567, at *5 (D.N.J. Aug. 31, 2010). Like Rose here, the court specifically cited the facts that the plaintiff insurance agents: (1) were paid commissions; (2) sold insurance products; (3) testified that they engaged in sales activities away from the employer's place of business. *Id.* Numerous other courts have reached the same conclusion. *See, e.g., Taylor*, 2012 WL 10669, at *5 (granting summary judgment under outside sales exemption). *See also Christopher v. SmithKline Beecham Corp.*, No. 08-1498, 2009 WL 4051075 (D. Ariz. Nov. 20, 2009), *aff'd sub nom,* 635 F.3d 383 (9th Cir. 2011), *aff'd*, 132 S. Ct. 2157 (2012) ("Outside salespeople are exempt from the overtime compensation requirement because of the distinct characteristics of their jobs—incentive pay based on individual effort; flexible, unregulated work hours; and minimal supervision making adherence to an hours-based compensation scheme impractical").

In addition, the Department of Labor has expressly recognized that insurance agents fall within the outside sales exemption. DOL Opinion Letter FLSA 2009-28, 2009 WL 649036 (Jan. 6, 2009). The DOL opined that insurance agents who, like Rose, make sales and obtain orders for life insurance and other insurance and financial products were exempt under the outside sales exemption because they:

- make sales "directly to clients, primarily through face-to-face meetings at the clients' homes or places of business . . . or [at] a restaurant or club";

- typically "spend a majority of their time performing tasks directly related to their own sales activities";

- communicate with clients by telephone, direct mail, and e-mail as an adjunct to their in-person sales calls, and these communications occur both outside of and within their offices;

- spend time in the office performing tasks that are related to their attempt to sell products to clients, such as preparing for client meetings, creating and working with documents or databases related to clients or the sale of insurance, following up on applications; educating themselves or attending training on their company's products, creating marketing or promotional activities in support of their own sales activities; and conducting research to select the specific types and amounts of insurance products to recommend and sell to clients to best meet the client's needs;

- are "responsible for originating their own sales and developing their own client lists by contacting or networking with current or prospective clients and by developing and maintaining relationships with sources of leads and referrals";

- receive training regarding the company's products and sales techniques, and the regulations governing their sales activities;

- typically determine their own hours and regularly travel to see clients and prospects during the workday, and sometimes in the evening and on weekends; and

- generally enter into commission arrangements with insurance companies that govern their compensation and are paid primarily or entirely through commissions on the insurance products they sell to clients.

*Id.* at 1-2. <u>All</u> of these facts exist as to Plaintiff Rose. *See supra* pp. 8-11. As to time spent outside of the office, the DOL stated that this requirement would be fulfilled where, again as here, the agent "me[t] clients face-to-face outside of the employer's place of business in order to initiate sales, such as at the client's home or business or at a restaurant or club." *Id.*

### 3. Uncontroverted Facts Establish That Rose's Primary Duty Was the Sale of Life Insurance and That He Was Customarily and Regularly Engaged Away From The Office To Do So.

As Rose repeatedly admitted in his deposition, his primary – indeed only – duty was "selling" insurance, and all of his activities were part of making those sales, or, at the very least, incidental to or in conjunction with his own sales activity. 56.1 Stmt. ¶ 90. He directed his work activities – from prospecting for clients to meeting with customers – toward closing sales. 56.1

Stmt. ¶ 91; Rose Tr. 154:25-155:8.  (A: "Well, yeah, the goal, there were lots of goals to work in the office, to dial, to network but it was all reaching towards the same goal though."  Q: "Of selling?"  A: "Yes.").  Rose made sales directly to clients through face-to-face meetings at clients' homes and places of business.  56.1 Stmt. ¶ 69.  He determined his own schedule and appointments and regularly traveled to see his clients and prospects during the workday.  56.1 Stmt. ¶ 93.

Like the insurance agents at issue in *Gold*, *Chenensky*, *Bouder*, *Lint*, and Opinion Letter FLSA 2009-28, Rose spent the majority of his time performing tasks directly related to his own sales activities, both in connection with the sales themselves and in his preparatory sales activities.  56.1 Stmt. ¶ 94.  He communicated with clients by telephone and e-mail as an adjunct to his in-person sales calls.  56.1 Stmt. ¶ 95.  Rose spent time in the office preparing for client meetings and determining the specific types and amounts of insurance products to recommend and sell to his clients.  56.1 Stmt. ¶ 96.  Rose clearly originated his own sales and developed his own client lists by contacting or networking with current or prospective clients and by developing and maintaining relationships with leads and referrals.  56.1 Stmt. ¶ 97.  Most indicative that selling was Rose's primary duty is that his source of income was tied directly to his sales.  56.1 Stmt. ¶ 98.  Rose received no commission unless he closed a sale.  56.1 Stmt. ¶ 34; *see also, e.g.*, *Holden*, 2009 WL 440937, at *5 (noting that the commissions of Northwestern Mutual insurance agents come from "the sale of various insurance and securities products").

Like the insurance agents in *Gold*, *Chenensky*, *Bouder*, *Lint*, and Opinion Letter FLSA 2009-28, the undisputed facts also confirm that Rose customarily and regularly spent time outside of the office.  He regularly met with clients outside of the office at their homes and places of business, and sometimes those client appointments could take several hours.  56.1 Stmt. 56.1 Stmt. ¶ 69.  Accordingly, Rose's testimony clearly establishes that he was "customarily and

regularly engaged" outside of the office for the purpose of making insurance sales.  Given the

foregoing facts and consistent legal authority holding that insurance agents in circumstances such

as exist here are outside salespersons, even if the Court determines that Rose was an employee it

should dismiss Rose's claims based on the outside salesperson exemption.

## IV.    CONCLUSION

For all the reasons stated above, Defendants' motion should be granted, and the claims

addressed in the motion should be dismissed in their entirety, together with such other and

further relief as the Court deems just, proper and equitable.

Dated:  New York, New York                      Respectfully submitted,
        July 22, 2016

                                       MORGAN, LEWIS & BOCKIUS LLP

                               By: */s Christopher A. Parlo*
                                     Christopher A. Parlo
                                     101 Park Avenue
                                     New York, New York 10178-0060
                                     (212) 309-6000
                                     (212) 309-6001 (fax)

                                     *Attorneys for Defendants*

DB1/ 88496541.1

25