UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH ROSE, individually and on behalf of all other persons similarly situated,<br><br><div align="right">Plaintiffs,</div><br>- against -<br><br>NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, NORTHWESTERN MUTUAL INVESTMENT SERVICES LLC, and any related entities,<br><br><div align="right">Defendants.</div> | Case No. 14-CV-3569 |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

VIRGINIA & AMBINDER, LLP
James E. Murphy
Suzanne Leeds Klein
40 Broad Street, 7th Floor
New York, New York 10004
Tel: (212) 943-9080
Fax: (212) 943-9082
lambinder@vandallp.com

LEEDS BROWN LAW, P.C.
Jeffrey K. Brown
Michael A. Tompkins
One Old Country Road, Suite 347
Carle Place, New York 11514
Tel: (516) 873-9550
Fax: (516) 747-5024
jbrown@leedsbrownlaw.com

*Attorneys for Plaintiff and Putative Class*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................. iv

PRELIMINARY STATEMENT ............................................................................ 1

SUMMARY OF UNDISPUTED FACTS ............................................................. 5

A) Northwestern Mutual's Internship Program.................................................5

B) Defendants Controlled All Meaningful Aspects of Rose's Employment.................8

    1) Defendants' Contractual Restrictions on Rose...........................................8

    2) Defendants' Day-To-Day Supervision of Rose..........................................9

C) Rose Primarily Worked From the New York City Office.................................11

LEGAL STANDARD ........................................................................................11

ARGUMENT....................................................................................................12

I. PLAINTIFF ROSE WAS NOT AN INDEPENDENT CONTRACTOR ..............................12

    A.    The Record Reflects That Rose Was Required to Work a Fixed Schedule and Attend Numerous Mandatory Meetings ................................................... 14

    B.    Rose Was Required to Make a Full-Time Commitment During His Summer Internship, Severely Limiting Other Job Opportunities ........................................14

    C.    NWM's Failure to Provide Fringe Benefits Will Not Shield Them From Liability ..........................................................................................15

    D.    Additional Factors Undermine Defendants' Independent Contractor Classification....................................................................................15

    E.    As a Summer Intern, Rose's Circumstances are Inapposite to the Authority on Which Defendants Rely..........................................................................17

II:   THE OUTSIDE SALES EXEMPTION IS NOT AT ISSUE AT THIS JUNCTURE, AND
      DOES NOT APPLY ............................................................................................18

            A.    The Outside Sales Exemption is Premature at this Juncture...........................18

            B.    Defendants Fail to Establish, as a Matter of Law, That Rose was an Outside
                  Salesman ..........................................................................................19

CONCLUSION ...........................................................................................................25

# TABLE OF AUTHORITIES

PAGE

**Cases**

*Ackerman v. Coca-Cola Enter., Inc.*,
179 F.3d 1260, 1266 (10th Cir. 1999)…………………………………………………24

*Bouder v. Prudential Fin.*,
2010 U.S. Dist. LEXIS 91541, 30 (D.N.J. Aug. 30, 2010)………………………………………24

*Bynog v. Cipriani Group, Inc.*,
1 N.Y. 3d 193 (2003)…………………………………..…………………………4,12,13,16

*Celotex Corp. v. Catrett*,
 593 F.3d 159, 166 (2d Cir. 2010)………………………………………………………………11

*Chenensky v. New York Life Ins. Co.*,
2009 U.S. Dist. LEXIS 119549 (S.D.N.Y. Dec. 22, 2009)…………...……………………...24,25

*Christopher v. SmithKline Beecham Corp.*,
132 S. Ct. 2156 (2012)………………………………………………………………………...23

*Hargrove v. Sleepy's LLC*,
2015 U.S.App.LEXIS 7832 (3rd Cir. May 12, 2015)……………………………………17

*Hart v. Rick's Cabaret Int'l, Inc*.,
967 F. Supp. 2d 901 (S.D.N.Y. 2013) ………………………………………… 13,15,16

*Hernandez v. Chefs Diet Delivery, LLC*,
81 A.D.3d 596, 597 (2d Dept. 2011)……………………………………………12,15,16

*Hopkins v. Cornerstone*,
545 F.3d 338 (5th Cir. 2008)…………………………………………………………..17,18

*Jewel Tea Co. v. Williams*,
118 F.2d 202 (10th Cir. 1941)…………………………………………………………20

*Killion v. KeHE Distributors, LLC*,
761 F.3d 574 (6th Cir. 2014)…………………………………………………………21

*Lint v. Northwestern Mut. Life Ins. Co.*,
2010 U.S. Dist. LEXIS 123117, *10 (S.D. Cal. Nov. 19, 2010)………………………………...24

iv

PAGE

*McGill v. Univ. of Rochester*,
  2015 U.S. App. LEXIS 1478, *5 (2d Cir. N.Y. Jan. 30, 2015) ...................................12

*Mednick v. Albert Enterprises, Inc.*,
508 F.3d 297, 303 (5th Cir. 1975) .........................................................................................1

*Morgan v. Family Dollar Stores*,
551 F.3d 1233 (11th Cir. 2008) ...........................................................................................22

*Murphy v. ERA United Realty*,
251 A.D.2d 469, 470-471 (2d Dept. 1998) ........................................................................16

*Noriko Ozawa v. Orsini Design Assocs.*,
  No. 13-CV-1282 (JPO), 2015 U.S. Dist. LEXIS 29933, 4-5
  (S.D.N.Y. Mar. 11, 2015) ...................................................................................................11

*Olivo v. GMAC Mortg. Corp.*,
374 F. Supp. 2d 545, 550 (E.D. Mich. 2004) ....................................................................25

*Sandifer v. U.S. Steel Corp.*,
134 S.Ct. 870, 879 (2014) ...................................................................................................20

*Taylor v. Waddell & Reed, Inc.*,
2012 U.S. Dist. LEXIS 212 (S.D. Cal. Jan. 3, 2012) .........................................................23

*Thomas v. Meyers Assoc., L.P.*,
39 Misc. 3d 1217(A) (N.Y. Sup. Ct. April 18, 2013) .......................................................13

*Tracy v. NVR, Inc.*,
293 F.R.D. 395 (W.D.N.Y. 2013) ......................................................................................24

*Wright v. Goord*,
  554 F.3d 255, 266 (2d Cir. 2009) .......................................................................................12

*Young v. Cooper Cameron Corp.*,
  586 F.3d 201, 207 (2d Cir. 2009) .......................................................................................25

**Statutes**

United States Code Chapter 29, Section 203(k) ............................................ 20,21,22,24

New York Labor Law Section 651 ............................................................................12

v

PAGE

29 C.F.R. § 541.500…………………………………………………………………...18, 20, 23

29 C.F.R. § 541.700…………………………………………………………………………...21

29 C.F.R. § 541.701…………………………………………………………………………...22

29 C.F.R. § 541.503…………………………………………………………………………...21

## PRELIMINARY STATEMENT

"An employer cannot saddle a worker with the status of independent contractor [where] the worker is not and never has been independently in the business which the employer would have him operate." *Mednick v. Albert Enterprises, Inc.*, 508 F.3d 297, 303 (5th Cir. 1975). In this case Defendants attempt to avoid liability by shoehorning a completely inexperienced young person who was recruited into an internship program and "never has been independently in the business which the employer would have him operate" into the "independent contractor" framework of their full-time, experienced sales agents. Defendants make this attempt despite the undisputed fact that the "internship program" promoted and implemented by the company was fundamentally different from the experience of the company's sales force.

Further, Northwestern Mutual prominently declaims that its internship program has been "Ranked #1 in Financial Services Industry [*sic*] For Record 20th Straight Year" (*see* Declaration of James Emmet Murphy, submitted herewith ("Murphy Dec."), Ex. L); that "Northwestern Mutual ranks #5 overall across all industries on Vault's Top Ten Internships for 2016" (*id.*); directs individuals interested in the internship program to get information from Northwestern's own website or from a "nearby Northwestern Mutual office" (*id.*); that "[m]ore than 3,300 college students are currently enrolled in Northwestern Mutual's internship program in *the company's* more than 350 offices around the country" (*id.*)(emphasis added); and took no steps to ensure that potential college student interns knew that they would be applying to work with independent agencies, rather than directly with Northwestern Mutual (P. 56.1[1], ¶178). Indeed, Northwestern Mutual's representative testified that an individual going through the process of applying to be a Northwestern Mutual intern *would have no knowledge* of the qualitative difference, if any, between

---

[1] "P. 56.1" refers to the facts and evidence contained within the accompanying Plaintiff's Statement of Additional Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment.

the experiences of interns at any one Northwest Mutual office versus another (Murphy Dec. Ex. K, p. 109:8-11). Nevertheless, Northwestern Mutual now claims that "college agent programs… are established and operated exclusively by the independent General Agencies that choose to implement such programs. Northwestern Mutual has no input into how the avarious General Agencies operate their respective programs." (Defendants' Memorandum, p. 3). Despite creating copious marketing materials and internal training documents which present the Northwestern Mutual internship as a single, cohesive unit, Defendants now argue that Northwestern Mutual has no internship program at all.

Plaintiff Joseph Rose (hereinafter as "Rose" or "Plaintiff") was recruited and engaged by Northwestern Mutual (hereinafter as "NWM" or "Defendants") to participate in an internship program while he was a full-time college student. Rose had no previous experience in the insurance industry, had no knowledge of the insurance industry, no client base, and no skills whatsoever specific to the insurance industry before participating in NWM's "internship program." Indeed, the materials provided by NWM to new "interns" specifically stated that they were not expected to have any skills whatsoever when the program started: "Congratulations on your decision to pursue an internship with [NWM]. We are very pleased to offer you the opportunity to establish a mutually beneficial relationship with [NWM] and develop the skills needed to achieve a successful career no matter what path you choose." (Murphy Dec., Ex. J, Internship Guidebook).

While working in NWM's New York City offices, Rose was required to attend mandatory meetings; had a quota for the number of calls he had to make each day to attract clients for NWM; had to use NWM's marketing materials; had to report time off to supervisors; and – most importantly – *could not make any sales on his own without a senior agent processing the transaction*. NWM's internship outline specifically told workers that they were *not* independent:

2

"[Y]ou are not in this alone. Both your network (or district network) office and the home office are here to support your efforts and help you make your internship experience everything you hope it will be and more." (Murphy Dec., Ex. J). This guidebook was not created by any independent agency, but rather directly by Northwestern Mutual's home office in Milwaukee (P. 56.1, ¶192), and contains guides on what to do during initial training, the first two weeks of the internship, and the remainder of the internship, and informing them that they will engage in "learning case preparation, role-playing with sales language," and engaging in other activities (P. 56.1, ¶193). Accordingly, Rose brought absolutely nothing to his employment with NWM – NWM provided the scripts for speaking with potential customers; the marketing materials for marketing NWM's products; the office space and the telephones and computers Rose used (unlike NWM's actual insurance agents); and the training necessary to attempt to sell NWM's products, along with the supervision to ensure Rose was acting in accordance with that training.

There is no dispute in this action that Defendants did not pay minimum or overtime wages to Plaintiff for the numerous hours he spent performing work. Instead, Defendants contend that Plaintiff was an independent contractor, and thus not entitled to any wage protections. Plaintiff, an inexperienced and unsophisticated college-age student, is exactly the type of worker New York's wage laws were enacted to protect. Plaintiff commenced this action in the New York State Supreme Court, alleging minimum wage and overtime violations of the New York Labor Law.

Defendants contend that Rose was properly classified as exempt from wage requirements because he "endeavored to create an insurance business of his own" (Def. Brief, pg. 2). At its core, an independent contractor is an individual with the freedom and requisite experience to run his own business with unfettered discretion. Under New York law, the determination of whether an individual is an independent contractor or employee "pertains to the degree of control exercised

by the purported employer over the results produced or the means used to achieve the results."
*Bynog v. Cipriani Group, Inc.*, 1 N.Y. 3d 193, 198 (2003).

As an intern, Rose was subject to extensive supervision and control, and thus was not an independent business owner, by even the loosest definition. The uncontroverted evidence demonstrates that Rose was required to work 35 to 40 hours each week in NWM's New York City office, inside the office five days each week, abide by a structured schedule, attend mandatory meetings on a daily basis, and reach a certain minimum threshold of cold calls each day, using the language from a script promulgated by NWM. Further, Rose was required to sign an overly restrictive agreement that, pursuant to its "exclusive dealing" clause, prohibited him from conducting business with any other life insurance company and required that he "devote full time to selling for Northwestern Mutual". (Def. Ex. 6). Defendants controlled the products and prices Rose could sell, where Rose could sell, and unilaterally controlled the amount of commissions he was eligible to receive. Notably, college interns were prohibited from completing sales on their own, and were thus required to be accompanied by a senior financial services representative to close deals due to their lack of experience and knowledge of Northwestern Mutual products and sales procedures. In the rare event that Rose's efforts resulted in NWM issuing an insurance policy, any profits stemming from those sales were retained by Defendants even after the internship ended. Indeed, Defendants controlled all major aspects of Rose's "business," and prohibited him from keeping the few clients he actually developed. Despite NWM's claims to the contrary, the contract that Rose signed was developed directly by NWM's home office, and has been in use in substantially the same form since 1967. *See* Murphy Dec. Ex. K, pp. 44:13-16, 43:20-44:14).

In support of their position, Defendants rely almost exclusively on determinations in other cases where experienced Northwestern Mutual *agents* were held to be independent contractors,

contending that those decisions are somehow applicable here. But Rose was *not* an agent—he was a student engaged in a 12 week summer internship program, and was incontrovertibly subject to far more supervision and control. The agent in charge of the office Rose worked out of testified that the NWM internship "allows you to get as close as you can to being a full-time representative *without actually being a full-time representative*." (P. 56.1, ¶124, Ex. B, Seery Tr., 99:16-19 (emphasis added)). If Rose was not *actually* a full-time representative, he certainly was not an independent business owner. Yet Defendants labeled him as such simply to enjoy the profits of his free labor and to avoid paying wages.

Defendants' second argument, that Plaintiff qualifies for the "outside sales" exemption, fails as Plaintiff was neither a "salesperson" nor engaged outside the office during his time as a summer intern. Moreover, this argument is premature, as the scope of discovery for purposes of this motion was limited to the independent contractor issue. (P. 56.1, ¶¶ 151-156).

As set forth in further detail below, Defendants' motion should be denied in its entirety, as Rose did not have the freedom indicative of an independent contractor relationship. Further, as Northwestern Mutual admittedly presents *itself* as having a single, unified internship program, it cannot now claim that no such thing exists and that the Seery Agency ran Rose' internship alone. At the very least, genuine issues of material fact exist, warranting denial of Defendants' motion.

## SUMMARY OF UNDISPUTED FACTS

### A) Northwestern Mutual's Internship Program

Northwestern Mutual offers internships to college students to provide "real world experience" while they pursue their studies and determine whether a career as a financial representative is the right path for them. (P. 56.1, ¶99). Northwestern Mutual touts its own internship program as "One of America's Top Ten Internships." (P. 56.1, ¶100). Students could

5

apply for an internship through the centralized NWM website. (P. 56.1, ¶101). NWM acknowledges that its internship program has not changed in the last ten years (P. 56.1, ¶ 157), that the contracts used by "college agents" were created by the NWM home office in 1967 and have been in use since that time (Van Grinsven Tr. pp. 43:20-44:16). NWM's home office engages in product branding and organizational sponsorship to promote its internship program (P. 56.1, ¶ 159-160), creates promotional material, literature, and videos regarding the internship program (P. 56.1, ¶161), maintains databases of policies sold with the assistance of college interns (P. 56.1, ¶165), identifies and conveys to general agencies "best practices" with respect to developing interns, and recruiting, training, and development initiatives (P. 56.1, ¶166); identifies and conveys successful strategies for interns (P. 56.1, ¶168); represents NWM at campus organizational conferences where they talk to students and provide them with materials regarding the internship program (P. 56.1, ¶169); and creates online materials which promote the "Northwestern Mutual internship" and direct interested students to a "nearby Northwestern Mutual office" (P. 56.1, ¶¶171-173). NWM's Internship Director spoke with Vault.com, who provided the "top 10 ranking" for NWM's internship program, about the program, and had no recollection of referring to any differences between internships at individual agencies, instead referring to the program as a cohesive whole (P. 56.1, ¶174). NWM's website offers videos of individuals "who work as financial representative interns at Northwestern Mutual" (P. 56.1, ¶177). The Seery Agency, with which Rose worked, boasts that "[s]ince 1967 nearly 41,000 students have become financial representative interns," (P. 56.1, ¶181), making no differentiation between interns at its own office or any other NWM offices. NWM's Internship Director acknowledged that an individual signing up for a NWM internship would have no knowledge of the qualitative difference, if any, between internships at different NWM offices (P. 56.1, ¶182).

College Unit Directors ("CUD's") were assigned to individual offices to oversee the internship program. (P. 56.1, ¶102). CUD's received training in the NWM's home office, located in Milwaukee. (P. 56.1, ¶¶103, 188). CUD's would also receive mentorship through monthly teleconferences with other CUD's from around the country. (P. 56.1, ¶104). Rose was recruited to NWM's internship program at a career fair he attended at his university where he filled out an application. (P. 56.1, ¶106, Rose Tr., 202: 7-13 ("I saw a banner that said Northwestern Mutual Internship Program, and then I believe I filled out an application.")). Rose was required to attend a two-week training program in White Plains New York. (P. 56.1, ¶108). CUD's received a stipend for their work as CUD's, which was partially paid by NWM and partially by their own agency (P. 56.1, ¶183). NWM's Creative Service Department created a guidebook directing CUD's how to perform their duties, and included books, audios, and tracking forms for intern activities which CUD's had to fill out and return to NWM's home office in order for their agencies to be reimbursed for their stipends (P. 56.1, ¶¶ 184-185). Indeed, when Krystan Boylan, Rose's CUD, entered into his college agent contract, she believed that she was doing so on behalf of Northwestern Mutual, not of the Seery Agency (P. 56.1, ¶189). NWM's home office created an "Intern Leadership Guide" for CUD's, which included information on how to promote the internship, how to source intern candidates, how to select interns, and "checklists" for CUD's and recruiters (P. 56.1, ¶190-191). The training period for interns consisted not only of courses from an outside company to prepare interns for the licensing exam, but also an orientation from a NWM representative to provide an overview of the company and products. (P.56.1, ¶111).

The internship program typically lasted up to 14 weeks, including the two-week initial training period. (P. 56.1, ¶114). Unlike full-time agents, interns were not required to pay for their own office space. (P. 56.1, ¶116). Likewise, interns were provided with cubicles, telephones, office

supplies and access to computers, at no cost. (P. 56.1, ¶117). Full-time agents were eligible to receive "TAP commissions," whereas interns were not. (P. 56.1, ¶118).

NWM was Rose's first exposure to the insurance industry. (P.56.1, ¶119). College agents were not required or expected to have any experience in the financial or insurance industry prior to their internship. (P. 56.1, ¶120). Most interns were between the ages of 18 to 21 years old, without any experience. (P. 56.1, ¶121). Although NWM classified interns as independent contractors, Rose's College Unit Director testified that interns lacked the requisite knowledge to sell products to a potential client. ("In my opinion, no, people can't do it right out of the gate." P. 56.1, ¶120, Boylan Tr., 231:5-25). NWM's internship program simply gave college students "the opportunity to test ride the full-time career." (P. 56.1, ¶¶ 123-124).[2]

**B) Defendants Controlled All Meaningful Aspects of Rose's Employment**

**1) Defendants' Contractual Restrictions On Rose**

Rose's College Student Agent's Contract ("Contract") defined and controlled all aspects of his relationship with NWM. [Def. Ex. 4]. Pursuant to the Contract's "Exclusive Dealing" requirement:

> Agent shall do no business for any other company which issues annuity contracts, or life insurance or disability income insurance policies, except in connection with Applications with respect to persons who are then insured by the Company [NWM] to the limit which it will issue on them or who are otherwise not acceptable for insurance by the Company or who have been found by the Company to be insurable only at higher than standard premium rates which are unacceptable to the applicants. [Def. Ex. 4, ¶ 6].

---

[2] Although Rose attempted to continue work for Defendants for a few weeks once he returned to school in New Paltz, he did so informally and only on a part-time basis, away from NWM's supervision, while he continued his studies. Rose's experience during those few weeks at New Paltz was fundamentally different from his experience while working in the White Plains or New York City offices. As such, Plaintiff only seeks compensation for the time spent during his summer internship.

The Contract further restricted agents by mandating that they "shall not accept business from, nor pay any commissions or other remunerations to, any person," (Def. Ex. 5, ¶ 7), preventing Plaintiff from acting as an independent contractor by hiring assistants. The Contract limited Plaintiff's ability to sell outside his assigned territory: "Solicitations outside the Territory shall be governed by regulations of the Company [NWM]". (Def. Ex. 5, ¶3). NWM had complete control over the amount and schedule of commission payouts. Def. Ex. 4, ¶ 16(a). Further, NWM had the power to unilaterally change a College Student Agent's commission schedule at any time. Def. Ex. 5, ¶ 16(b); P. 56.1, ¶¶ 125-132.

Plaintiff had absolutely no authority to alter any terms or conditions of the policies and contracts promulgated by NWM: "Agent shall have no power…to waive any forfeiture or to alter or discharge or waive any of the terms and conditions of any policy or contract." (Def. Ex. 5, ¶5). Most notably, upon termination of the Contract, Rose could no longer receive renewal commissions *for his own clients*. Such commissions become the sole property of NWM. (Def. Ex. 4, ¶ 19). Indeed, the Contract unequivocally mandates that "Renewal commissions not payable to Agent shall be retained by the Company [NWM]." (Def. Ex. 4, ¶ 19) (P. 56.1, ¶¶ 133-139).

### 2) Defendants' Day-To-Day Supervision of Rose

Contrary to Defendants' classification of Rose as an independent contractor, summer interns were required to adhere to a strict schedule. Rose was required to report to Defendants' office every day, on a full-time basis. Rose unequivocally testified that during his summer internship, he worked in the office "every day Monday to Friday, the work days…Every week" without any vacation days, with the exception of two bereavement days when his grandfather passed away. P. 56.1, ¶141, Rose Tr., 161:1-12. As recounted by Rose' CUD, "[t]here was an expectation that it was a full-time internship…Like 35 to 40 hours a week…It was communicated

9

that this would be their full-time role during the day during the summer." P. 56.1, ¶130, Boylan Tr., 65:14-23. If an intern needed to take time off, they were required to notify the College Unit Director in advance. P. 56.1, ¶148.

On a daily basis, Rose was directed to make cold calls for numerous hours, using language approved by NWM, pursuant to scripts promulgated by NWM. P. 56.1, ¶¶ 142-145, 149. Rose testified: "I used everything from Northwestern Mutual, the tools and scripts they provided me." P. 56.1, ¶149, Rose Tr. 214:25-215:3; *see also* Rose Tr. 216:24-217:9 ("I know there was a script. They had to, you can't just wing it. You had to do things a certain way...They just gave me the material to use. I didn't create anything to be approved."). As part of his initial training period, Rose was required to complete NWM's electronically-based "Market Descriptor Worksheet," "Strategy Statement," "Action Plan," and input his potential contacts and referrals into the NWM database. P. 56.1, ¶¶ 112-113; Def. Ex. 7.

Interns were required to reach a certain amount of telephone calls each day. P. 56.1, ¶142. Plaintiff testified about the pressure placed on interns to reach the threshold of calls each day:

> We would all talk amongst ourselves and I felt the pressure and they felt the pressure that we had to keep up pace. It was college students coming, you know, the first internship, the first internship for many people so, like, we have to make sure we are on pace and doing what is asked. (P. 56.1, ¶143, Rose Tr., 189:3-13)

Interns were required to attend meetings every morning. P. 56.1, ¶144. At these meetings, the interns would share their results and the amount of "dials" from the prior day. P. 56.1, ¶145, Rose Tr., 187: 22-188:4 ("we had to go over our activity for what we did for the day, how many meetings did you go on, how many dials you did"). Interns would also attend weekly developmental meetings to review particular products. P. 56.1, ¶147.

Critically, interns were *not permitted* to effectuate sales on their own, and were instead instructed to partner with senior representatives in client meetings. Rose's College Unit Director

testified that this policy was implemented because college agents "were between 18 and 21 years old without any experience, so we didn't want to have them meet with people and misrepresent products." P. 56.1, ¶150, Boylan Tr., 54:20-55:11. College interns were not trained on how to fill out the paperwork necessary to effectuate a sale. Rose testified:

> I had no idea how to fill out the paperwork. I was never trained. Like if I would have brought the paperwork, first of all, I didn't even know what it was but if I got it and I was there like with the customer and filling it out, I wouldn't know what to check off, what to do, how to set up the medical because every person needs to do a medical to apply for the insurance. I had no idea how to set that up.
> (Murphy Dec., Ex. C, Rose Tr., 197:11-20).

### C) Rose Primarily Worked From the New York City Office

Plaintiff spent the large majority of time working inside the New York office. P. 56.1, ¶155, Rose Tr., 161:1-6 ("I went in every day Monday to Friday, the work days."). Throughout the span of his 12-week internship in the New York office, Plaintiff attended a maximum of *only* six to eight attempted appointments outside the office with potential clients. P. 56.1, ¶156.

## LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law….'" *Noriko Ozawa v. Orsini Design Assocs*., No. 13-CV-1282 (JPO), 2015 U.S. Dist. LEXIS 29933, 4-5 (S.D.N.Y. Mar. 11, 2015) (*quoting Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). A "dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party." *Id*. (*citing Ricci v. DeStefano*, 557 U.S. 557, 586, (2009) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)). Summary judgment is proper when overwhelming evidence supports the movant's claims. *See e.g.*

11

*McGill v. Univ. of Rochester*, 2015 U.S. App. LEXIS 1478, *5 (2d Cir. N.Y. Jan. 30, 2015) (*citing Richardson v. Comm'n on Human Rights & Opportunities,* 532 F.3d 114, 125-26 (2d Cir. 2008).

The movant bears the burden of demonstrating the absence of a question of material fact. The Court must view all facts "in the light most favorable" to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

As set forth below, viewing all facts in the light most favorable to Plaintiff, it cannot be argued that Rose was properly classified as an independent contractor as a matter of law.

## ARGUMENT

### I.   PLAINTIFF ROSE WAS NOT AN INDEPENDENT CONTRACTOR

The record reflects that Rose, a college student with no experience in the insurance industry, was not an independent contractor and/or an independent business owner by even the loosest definition. Indeed, Rose could not possibly have been considered to be in business for himself, since he was prohibited from effectuating sales on his own. P. 56.1, ¶ 150, Boylan Tr., 54:20-55:11; *see also* Rose Tr., 201:7-11. In reality, Rose was merely engaged in a training program, subject to the strict supervision and control of Defendants. The definition of an employee is extremely broad under New York law, with its statutory definition including "any individual employed or permitted to work by an employer in any occupation." *See* New York Labor Law § 651(5). The New York Court of Appeals has stated that "the critical inquiry [in determining an employment relationship] pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003); *see also Hernandez v. Chefs Diet Delivery, LLC*, 81 A.D.3d 596, 597

(2d Dept. 2011); *Thomas v. Meyers Assoc., L.P.*, 39 Misc. 3d 1217(A), *7 (N.Y. Sup. Ct. April 18, 2013). To determine whether a worker is an employee, New York courts assess a variety of factors, such as whether the worker (1) worked at his/her own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll, and (5) was on a fixed schedule. *Bynog*, 1 N.Y.3d at 198. The test for whether an individual worker is properly classified as an "independent contractor" or an "employee" under the New York Labor Law is similar to, but not identical to, that used under the FLSA. As one Southern District Judge recently explained:

> [T]he New York Court of Appeals has articulated a standard for determining whether a worker is an employee or an independent contractor under the NYLL that is phrased differently than the FLSA inquiry. New York courts apply the 'common law' test – a test used not only in connection with wage-protection statutes, but also to determine such issues as *respondeat superior* liability in tort suits, eligibility for unemployment benefits, and compliance with tax laws. Although 'substantially similar' to the FLSA, *see Browning v. Ceva Freight, LLC, 885 F. Supp. 2d 590, 599 (E.D.N.Y. 2012)*, the common law focuses more on 'the degree of control exercised by the purported employer,' as opposed to the 'economic reality of the situation,' *Velu v. Velocity Express, Inc., 666 F. Supp. 2d 300, 307 (E.D.N.Y. 2009)*. Specifically, the New York Court of Appeals has stated that 'the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results.' *Bynog v. Cipriani Grp., Inc., 1 N.Y.3d 193, 198, 802 N.E.2d 1090, 770 N.Y.S.2d 692 (2003)*; *see Matter of Ted Is Back Corp., 64 N.Y.2d 725, 726, 475 N.E.2d 113, 485 N.Y.S.2d 742 (1984)* ('control over the means is the most important factor to be considered" when analyzing an employment relationship'); *see also In re Hertz Corp., 2 N.Y.3d 733, 735, 811 N.E.2d 5, 778 N.Y.S.2d 743 (2004)* ('An employer-employee relationship exists when the evidence demonstrates that the employer exercises control over the results produced by claimant or the means used to achieve the results.' (citing *Matter of 12 Cornelia St., 56 N.Y.2d 895, 897, 438 N.E.2d 1117, 453 N.Y.S.2d 402 (1982)))*.

*Hart v. Rick's Cabaret International, Inc.*, 2013 U.S.Dist.LEXIS 129130*47-48 (S.D.N.Y. Sep. 10, 2013) (Engelmayer, D.J.). As such, Defendants' substantial reliance on federal authority from outside this Circuit is misapplied [*see e.g.* Def. Brief, pg. 16], as New York's common law test of independent contractor status is wholly distinct from the federal economic realities test. *Id.*

13

Here, the record substantiates that NWM exercised a "degree of control" indicative of an employee relationship. At the very least, the evidence demonstrates that genuine issues of material fact exist regarding Rose's employee status.

### A) The Record Reflects That Rose Was Required to Work A Fixed Schedule and Attend Numerous Mandatory Meetings

The uncontroverted evidence demonstrates that during his summer internship, Rose was required to work a full-time schedule in the office, five days each week. P. 56.1, ¶¶ 134, 140-141. Plaintiff unequivocally testified that he worked in the office every day, Monday through Friday, every week. P. 56.1, ¶141.

Further undermining Defendants' contention that Rose "worked at his own convenience" [Def. Brief, pg. 14], he was required to attend a meeting with his College Unit Director every single morning. P. 56.1, ¶¶ 144-145. Additionally, Rose was required to notify the College Unit Director in advance if he planned to take time off. P. 56.1, ¶148. Rose testified that he did not use any vacation days during his internship, and *only* took two days for bereavement when his grandfather passed away. P. 56.1, ¶141, Rose Tr., 161:1-12. The strict schedule imposed upon Rose weighs heavily in favor of a finding of employee status.

### B) Rose Was Required To Make A Full-Time Commitment During His Summer Internship, Severely Limiting Other Job Opportunities

Defendants contend that Rose was properly classified as an independent contractor because he was free to engage in other work during his internship. Def. Brief, pg. 11, 14]. Undermining this position, Rose's Contract Application unequivocally mandated that Rose "devote full time to selling for Northwestern Mutual." P. 561., ¶133; Def. Ex. 6, Contract Application, ¶2. Further, Rose's College Unit Director unequivocally testified that interns were expected to work a full-time schedule of 35 to 40 hours each week. P. 56.1, ¶140. These time constraints rendered it nearly

14

impracticable to engage in other work. NWM's "Exclusive Dealing" mandate prohibited Rose conducting any business for other life insurance companies, further restricting Rose's ability to engage in other job opportunities. P. 561., ¶135; Def. Ex. 5, Contract, ¶6.

Moreover, that Rose could have taken another job outside of the 40 hours a week he committed to NWM "is of limited relevance under the NYLL." *Hart*, 967 F. Supp. 2d at 925. Workers who are irrefutably considered employees are free to hold second jobs outside of their regular working hours. *Id.* Defendants misconstrue the testimony and evidence regarding Rose's purported second job at Belltower Books. Def. Brief, pg. 12. Rose's work at Belltower was on a seasonal basis, lasting only two to three weeks at the end of each school semester when students were interested in selling used textbooks. 56.1, P. Response, ¶24. Rose's work at Belltower did not overlap with his full-time summer internship at NWM. *Id.* This factor does not support a finding of independent contractor status.

### C) NWM's Failure To Provide Fringe Benefits Will Not Shield Them From Liability

Although Rose was not given fringe benefits and did not receive an hourly wage, courts have found such factors to be "unimportant." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 925 (S.D.N.Y. 2013). "To assign this factor much weight would effectively allow any employer to control, under New York law, a worker's status simply by labeling her an independent contractor and denying her employee benefits." *Id.* Likewise, "it is not significant how the parties defined the employment relationship or how the worker identified herself on tax forms." *Hart*, 967 F. Supp. 2d at 924 (*citing Sandrino v. Michaelson Assocs., LLC,* 2012 U.S. Dist. LEXIS 165143 (S.D.N.Y. Nov. 19, 2012); *Hernandez*, 81 A.D.3d at 599).

### D) Additional Factors Undermine Defendants' Independent Contractor Classification

15

New York courts typically look beyond the *Bynog* factors to assess whether the purported employer actually controlled the "means used to achieve the results." *Hart*, 967 F. Supp. 2d at 926 (*citing Hernandez*, 81 A.D.3d at 598) (other citations omitted). Here, analysis of additional factors further undermines Defendants' entitlement to summary judgment.

In *Hernandez v. Chefs Diet Delivery, LLC*, 81 A.D.2d 469 (2d Dept. 2011), the court considered additional factors in its determination that the plaintiffs qualified as employees, including that defendants provided daily instructions, reimbursed drivers for mileage, required the plaintiffs to attend mandatory meetings, obtain approval for vacation time and undergo training. 81 A.D.3d 596, 598 (2d Dept. 2011) – factors largely identical to those present here. Further instructive is *Murphy v. ERA United Realty*, 251 A.D.2d 469, 470-471 (2d Dept. 1998), where although the commissioned salesperson signed an agreement stating she was an independent contractor, the court denied the defendant's motion for summary judgment because, as here, the defendant required that the plaintiff work at least 40 hours each week, use company forms, attend mandatory sales meetings, attend regular training meetings, and coordinate vacation time.

Defendants here exercised similar control by requiring Rose to work a full-time schedule of at least 35 to 40 hours each week, mandating attendance at daily meetings, providing daily instructions regarding telephone dials and scripts, requiring interns to undergo initial training and participate in developmental meetings, requiring approval of vacation time and covering costs for office space and supplies. P. 56.1, ¶¶ 140-150. The court in *Murphy* further reasoned that the broker was not an independent contractor because, as here, she was not permitted to work for any other real estate broker and was required to share all of her leads and commissions with the company. *Murphy*, 251 A.D.2d at 471. Likewise, here Rose's Contract Application explicitly stated that he "may NOT do business for any other life insurance company" [Def. Ex. 6, ¶3 (emphasis in

16

original)]. Rose was also required to input all of his potential contacts into the NWM database and his commissions were retained by the company, even after his termination when he was ineligible to receive them. P. 56.1, ¶¶ 113, 138.

The Fifth Circuit Court of Appeals in *Hopkins v. Cornerstone*, 545 F.3d 338 (5th Cir. 2008), a wage case involving insurance agents with similarly restrictive contracts as here, held the agents to be misclassified employees, reasoning that:

> The Court is unable to perceive how any individual logically can be said to be in business for himself when he has no control over what product or service the business offers; no control over the price of that product or service; no control over the advertising of that product or service; and no control over the hiring and firing, compensation rate, promotion or demotion, and assignment or reassignment of individuals directly responsible for the business's bottom line.

*Hopkins*, 512 F. Supp. 2d at 689. Here, Defendants imposed similar restrictions that also undermine the independent nature of the position. P. 56.1, ¶¶ 99-196].

### E) As A Summer Intern, Rose's Circumstances Are Inapposite to the Authority On Which Defendants Rely

Defendants repeatedly rely on authority from other circuits regarding independent insurance agents of Northwestern Mutual. Def. Brief, pg. 17. These cases are irrelevant, however, for two distinct reasons. First, those courts did not analyze the independent contractor exemption under the framework of New York's common law test, which is different from the "economic realities" test used under the FLSA. Federal Courts determining independent contractor status under state wage laws are required to apply the State's test for independent contractor status, not Federal tests. As recently held by the Third Circuit in *Hargrove v. Sleepy's LLC*, 2015 U.S.App.LEXIS 7832*6-7 (3rd Cir. May 12, 2015):

> Here, the District Court's rationale for denying Appellants' motion for summary judgment was… based on [*Nationwide Mutual Insurance Co. v.*] *Darden* [503 U.S. 318 (1992)], and it did not consider the possible application of the "ABC" test [adopted by the New Jersey Supreme Court] or any others.

17

Therefore, we will vacate the grant of summary judgment and remand this matter to the District Court for it to apply, in the first instance, New Jersey law to the question whether the Appellants are employees or independent contractors.

Most importantly, Defendants' authorities all pertain to experienced financial service representatives, rather than college-student "interns" who cannot making sales on their own. As a summer intern, Rose's experience was markedly different from that of a seasoned agent. Unlike full-time agents, interns were not required to pay for their own office space. They were provided with cubicles, telephones, office supplies and access to computers, at no cost.

NWM was Rose's first exposure to the insurance industry, and as such, the position did not require "the type of skill and initiative typically indicative of independent-contractor status." *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 345 (5th Cir. 2008). *See* Murphy Dec. Ex. C, Rose Tr., 41: 23-42:2 ("So you came in completely cold? Yes"). Although NWM classified interns as independent contractors, Rose's CUD testified that interns lacked the requisite knowledge to competently sell products to a potential client. P. 56.1, ¶122, "In my opinion, no, people can't do it right out of the gate." Ex. B, Boylan Tr., 231: 5-25.

Most notably, interns were not permitted to effectuate sales on their own, and were instead required to partner with senior representatives due to their inexperience. P. 56.1, ¶¶ 122, 150]. Interns were merely there to "test ride the career" of an agent, instead of actually working as an agent. P. 56.1, ¶¶ 123-124]. They were thus subject to far more training, oversight and supervision than full-time agents engaged in a career. These considerations further weigh in favor of a finding of employee status.

## II.    The Outside Sales Exemption Is Not At Issue At This Juncture, And Does Not Apply

### A) *The Outside Sales Exemption Inquiry Is Premature At This Juncture*

Defendants' arguments regarding the outside salesperson exemption should be disregarded *in toto* for a variety of reasons. First, whether Plaintiff qualifies as an outside salesperson was not the subject of the limited discovery the Court directed the parties to conduct, and thus not at issue on this motion. Instead, at the August 4, 2014 Initial Conference before the Honorable Gary R. Brown, the Court instructed the parties to conduct discovery limited to the issue of whether the Plaintiff was an independent contractor. *See* Ex. F, Transcript of Initial Conference. Specifically, Judge Brown reasoned:

> But I have a real job to do which is to schedule discovery, and figure out— the best way to do it and most efficient way for the Court. And I'm thinking rather than have everyone take the time, and pay the money to identify 3,500 people to start with, and identify all them to opt in or opt out, whatever, just in the State alone, let alone the national piece that you'd like to then do, *why wouldn't we resolve the independent contractor issue first?*

P. 56.1, ¶¶ 151-154, Ex. F, 13:11-20 (emphasis added); 15:1-11 ("But the part that's bothering me is, either from a collective or class action perspective, <u>if there's this issue about independent contractor</u>") (emphasis added)). Wwhen the parties requested an extension of this limited discovery period, Defendants noted that additional time was needed to complete discovery "on the issue framed by the court—whether plaintiff can survive a motion for summary judgment on the issue of *whether he was properly classified as an exempt independent contractor*." Ex. G, Defendants' November 21, 2014 letter regarding an extension of time (emphasis added). Moreover, as represented by Defendants, "to the directive of this Court [was] to *limit discovery to the issue of the independent contractor status* of the Plaintiff" (Ex. H, Defendants' February 5, 2015 pre-motion conference letter, Dkt No. 15 (emphasis added); *see also* Ex. G, fn 1 (Defendants noted: "At the initial Conference on August 4, 2014, the Court limited discovery to the issue of *whether Plaintiff was an independent contractor*.") (emphasis added)).

**B)** ***Defendants Fail To Establish, As a Matter Of Law, That Rose Was An Outside Salesman***

Although the outside sales exemption is not at issue at this stage, the record reflects that Rose does not fall within this exemption. It is well settled that "exemptions in the Fair Labor Standards Act are to be narrowly construed against the employers seeking to assert them." *Sandifer v. U.S. Steel Corp.*, 134 S.Ct. 870, 879 (2014). In order to be subject to the outside sales exemption, a worker must be *employed* as an outside salesperson. An outside sales person is one whose "primary duty is… making sales within section 3(k) of the Act, or… obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer, and… Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500; *see also Jewel Tea Co. v. Williams*, 118 F.2d 202, 208 (10th Cir. 1941) (An outside salesperson is one who "works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day.")

Under 29 U.S.C. § 203(k), "sales" is defined as "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." Here, Rose was recruited into a 12 week college intern program. In this capacity he was not engaged in "sales," because he was not permitted to complete a transaction on his own without assistance from experienced sales agents and supervisors, and was thus unable to effectuate any "sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." Rose testified:

> I said, listen, I got an appointment and I'm going to close, what should I do? You should bring someone, go ask one of the full-time reps to help you fill out the paperwork. I'm an intern, 20-year-old college kid. What am I going to do?... No way I could do it on my own.

*See* Ex. C, Rose Tr., 201:7-14. Defendants' College Unit Director similarly testified that college interns normally went on sales meetings with senior agents, who would typically take the lead in effectuating a transaction:

20

"college agents were encouraged to do joint work, which is essentially partnering with a more senior representative in client meetings… they were between 18 and 21 years old without any experience, so we didn't want to have them meet with people and misrepresent products… If it was a prospect who was serious about the process, the senior representative would likely take the lead simply because they know the flow of the questions that should be asked to get the information to ultimately produce a solution. If it was more of a casual getting to know you meeting, it might just be a three-way conversation between all three people."

Ex. B, Boylan Tr., 54:20-56:12.

Indeed, NWM's Internship Director himself testified that NWM interns are "contracted to identify people that would like to apply for an insurance contract," and nothing more (P. 56.1, ¶196) – consistent with the CUD's testimony that college interns were engaged to identify potential customers, and then have an experienced agent conduct the actual sale. Where actual sales are controlled by senior salespersons and any "sales" attempts by a worker are subject to approval by superiors, workers may not be engaged in "sales" activities within the meaning of 29 U.S.C. § 203(k). *See Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 584 (6th Cir. 2014).

Further, it is clear that Rose's "Primary Duty" was not to engage in sales. "To qualify for exemption under this part, an employee's 'primary duty' must be the performance of exempt work. The term 'primary duty' means the principal, main, major or most important duty that the employee performs." *See* 29 C.F.R. § 541.700. "In determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's *own* outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work." *See* 29 C.F.R. 541.500 (emphasis added). However, such "incidental" work must be performed in connection with a salesperson's *own* sales in order to trigger the exemption: "promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work." *See* 29 C.F.R. § 541.503.

In recruiting Rose at the college fair, NWM's internship program was described as "the opportunity to establish a mutually beneficial relationship with [NWM] and develop the skills needed to achieve a successful career no matter what path you choose." Murphy Dec., Ex. J, Internship Guidebook, pg. 2. As part of this "mutually beneficial relationship," Rose engaged in marketing and promoting NWM's products in order to *effectuate sales made by someone else*. NWM directly profited from Rose's marketing efforts both through his general efforts to promote NWM's name and products to the general public, and through the continued revenue streams generated by residual insurance policy payments by any customers Rose brought to senior sales agents. None of Rose's work, though, was performed in furtherance of Rose's sales, since Rose was not capable of making any sales. P. 56.1, ¶150; *See* Rose Tr., 201:7-14.

Finally, Rose was not "customarily and regularly engaged away from the employer's place or places of business" within the meaning of 29 C.F.R. § 541.500. Pursuant to 29 C.F.R. § 541.701, the term "customarily and regularly" means "a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." *See, e.g. Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1274 (11th Cir. 2008). Rose spent the vast majority of his time working within the New York City office. P. 56.1, ¶¶ 155-156. Rose testified that throughout the entire span of his 12-week internship in the New York office, he attended a maximum of *only* six to eight appointments outside the office (P. 56.1, ¶, Rose Tr., 320:25-321:8), clearly less frequently than every workweek. NWM has admitted that they did not record how many outside-the-office meetings Rose held (Def. Brief pg. 12. It is thus beyond dispute that he did not go "outside the office" to perform sales meetings "every

workweek," as would be required of someone "customarily and regularly" engaged away from the employer's place of business.

Defendants reference the U.S. Department of Labor's ("DOL") interpretation of the Federal outside sales exemption in Opinion Letter 2007-2, defining exempt workers as those engaged in outside sales meetings "one or two times a week." (Def. Brief, pg. 20). Rose was required to report to the office every day and spent his entire day in the office, with the exception of a few sporadic attempted appointments with potential clients, which happened fewer than one time per week. P. 56.1, ¶¶ 155-156. Thus, irrespective of whether the U.S. DOL interpretation would even be binding on this Court and relevant to this purely New York Labor Law action, Rose's time outside the office was so infrequent and limited that he could not be considered exempt even under the U.S. DOL's broad definition of the outside sales exemption. P. 56.1, ¶156. Rose's limited outside work of a maximum of six to eight attempted sales calls in a 12 week period amounts to far less than the U.S. DOL threshold of at least once a week.

Rose would typically spend his days attending various meetings and cold-calling to meet the requisite amount of "dials." P. 56.1, ¶¶ 142-143, 155. Defendants rely on authority that is clearly distinguishable, as in those cases the salespeople spent the majority of their day outside the office. Def. Brief, pg. 19-20. *See e.g. Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2164 (2012) (pharmaceutical representatives spent 40 hours each week visiting doctors' offices, and were "well compensated" for their efforts[3]); *Taylor v. Waddell & Reed, Inc.*, 2012 U.S. Dist. LEXIS 212, 11-13 (S.D. Cal. Jan. 3, 2012) (plaintiff engaged in sales activities outside the office

---

[3] The outside sales exemption "is premised on the belief that exempt employees 'typically earned salaries well above the minimum wage'" *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. at 2173 (*citing* Preamble 22124). Rose spent his summer internship working a full-time schedule *within* the New York City office, attending mandatory meetings, engaged in cold-calling for hours on end at Defendants' behest, without receiving even minimum wage rates for each week he worked.

at least three or four days some weeks, and was regularly absent from company meetings); *Tracy v. NVR, Inc.*, 293 F.R.D. 395 (W.D.N.Y. 2013) (model home sales persons worked away from office anywhere from 25-70% of time); *Lint v. Northwestern Mut. Life Ins. Co.*, 2010 U.S. Dist. LEXIS 123117, *10 (S.D. Cal. Nov. 19, 2010) (defendant's unopposed motion for summary judgment granted where agent met with approximately 50 clients outside of the office each week and drove 4,000 miles each month in doing so). Defendants' reliance on authority that adopted the U.S. DOL's definition of outside sales as "one or two times a week" only serves to support Rose's claims, as his attempted outside appointments do not even meet that minimum threshold. P. 56.1, ¶156 (a maximum of six or eight attempted meetings over the course of his 12-week internship).

Defendants' reference to 29 C.F.R. § 541.500(b) to support the proposition that "work performed incidental to and in conjunction with" outside sales is exempt work is misplaced [Def. Brief, pg. 18]. First, this provision applies by its terms only to a worker's *own sales*, and not to work performed, as here, incidental to sales made by or with the direct guidance of another salesperson; and, second, Rose does not even meet the minimum amount of outside appointments to qualify for the exemption. Moreover, unlike the cases on which Defendants rely, *all* of Rose's promotional and marketing work was conducted *within* the office using NWM's sales material and scripts. Def. Brief, 19-20. For this reason, Defendants' reliance on *Chenensky v. New York Life Ins. Co.*, 2009 U.S. Dist. LEXIS 119549, 5-6, 16 (S.D.N.Y. Dec. 22, 2009) (Def. Brief, pg. 22), is misplaced, as there the plaintiff spent most of his time out in the field, even when he was "trolling" for business. In *Bouder v. Prudential Fin.*, 2010 U.S. Dist. LEXIS 91541, 30 (D.N.J. Aug. 30, 2010) (Def. Brief, pg. 22), the testimony demonstrated that the insurance agents regularly engaged in sales outside the office at customers' homes. *See also Ackerman v. Coca-Cola Enter., Inc.*, 179 F.3d 1260, 1266 (10th Cir. 1999) (work performed by sales representatives *outside the office* at the

site where, and in conjunction with, sales consummated considered incidental to those sales); *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 550 (E.D. Mich. 2004) (loan officers fall under outside sales exemption where worked *primarily* outside of the office).

Likewise, Defendants' reliance on the U.S. DOL Opinion Letter FLSA 2009-28 (Jan. 6, 2009) (Ex. I) (Def. Brief, pg. 24) does not impact Rose's claims, as the letter explicitly makes clear that "agents who do not engage in outside sales activity as a normal and recurrent part of their workweek fail to meet the exemption's requirements." "Inside sales" and other work conducted inside the office would not fall under the outside sales exemption. *See* 69 FR 22122, 22161, Vol. 69, No. 79, Part II, April 23, 2004.

"Courts applying the outside salesperson exemption consider whether sales are made by the employee but also look for hallmark activities including: (1) whether the employee generates commissions for himself through his work, (2) the level of supervision of the employee, (3) the amount of work done away from the employer's place of business, (4) whether the employee independently solicits new business, and (5) the extent to which the employee's work is unsuitable to an hourly wage." *Chenensky v. New York Life Insurance Company*, 2009 U.S.Dist.LEXIS 119549*13 (S.D.N.Y. Dec. 22, 2009) (Pauley, D.J.). "[B]ecause the FLSA is a remedial statute, this exemption must be narrowly construed [and] the employer has the burden of proving that the employee clearly falls within the terms of the exemption." *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 204 (2nd Cir. 2009). Here, it is not disputed that the commissions Rose generated were not for himself, but had to be shared with the senior agent who actually made the sale.

## CONCLUSION

Northwestern Mutual has marketed its "nationally-recognized internship program, which was named by Vault.com the #1 internship for students seeking careers in the financial services

industry," (Murphy Dec. Ex. L), boasting that it is "extremely proud of our long track record of providing college students with the tools and resources they need to achieve success after graduation" (*id*.). The documents Defendants rely on to claim that Seery advertised its own independent internship program instead invite teenagers to "INTERN WITH A FORTUNE 500 COMPANY!... built on more than 155 years of experience and satisfaction with over $180 billion in assets and $26 billion in revenues." (Parlo Dec. Ex. 10, p. 40). Defendants' Internship Director provided promotional materials advertising the nationwide internship as a single program; produced guidebooks for CUD's and coordinated training events for them; and paid portions of CUD's stipends for their work recruiting and training interns. Rose's own CUD believed she was acting on behalf of NWM, not her agency. For NWM to now allege that "there is virtually no contact between Northwestern Mutual and the General Agents or CUDs who run the programs" (Def. Mem. P. 10) is contrary to everything that they present to potential recruits like Rose, and everything that interns like Rose experience. For the reasons stated above, Defendants' motion for summary judgment should be denied in its entirety, together with such other and further relief as the Court deems just and proper.

Date:   New York, New York
            September 2, 2016

                                                    VIRGINIA & AMBINDER, LLP

                                                    /s/ James Emmet Murphy
                                                    Suzanne Leeds Klein
                                                    James Emmet Murphy
                                                    40 Broad Street, 7th Floor
                                                    New York, New York 10004
                                                    Tel:    (212) 943-9080
                                                    Fax:    (212) 943-9082

                                                    Jeffrey K. Brown
                                                    Michael A. Tompkins
                                                    LEEDS BROWN LAW, P.C.

One Old Country Road, Suite 347
Carle Place, NY 11514
Tel:     (516) 873-9550
Fax:     (516) 747-5024

*Attorneys for Plaintiff and Putative Class*

To:     MORGAN, LEWIS & BOCKIUS LLP
         Christopher A. Parlo
         101 Park Avenue
         New York, New York 10178
         Tel:     (212) 309-6000
         Fax:     (212) 309-6001

         *Attorneys for Defendants*