UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

№ 14-CV-3569 (JFB) (AYS)
_____

JOSEPH ROSE,
INDIVIDUALLY AND ON BEHALF OF ALL OTHER PERSONS SIMILARLY SITUATED,

Plaintiffs,

VERSUS

NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY AND
NORTHWESTERN MUTUAL INVESTMENT SERVICES LLC,

Defendants.
_____

MEMORANDUM AND ORDER
December 12, 2016
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Joseph Rose ("plaintiff" or "Rose") brings this putative class action against Northwestern Mutual Life Insurance Company ("Northwestern Mutual") and Northwestern Mutual Investment Securities LLC ("NMIS") (collectively, "defendants") alleging New York state law claims for minimum wage and overtime violations pursuant to N.Y. Labor Law ("NYLL") §§ 650 *et seq.* and N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2.

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and argue that (1) plaintiff was an independent contractor, and not an employee, of Northwestern Mutual and thus exempt from New York's minimum wage and overtime laws; or alternatively (2) even if plaintiff was an employee, he worked as an "outside salesperson" and was therefore also exempt. In addition, defendants assert that plaintiff has no cause of action against NMIS because there was no relationship between the parties. For the reasons stated below, the motion is granted.

Despite months of supplemental discovery, the uncontroverted evidence shows that: (1) plaintiff signed a contract designating him as an independent contractor, rather than an employee, of Northwestern Mutual; (2) plaintiff was aware that he was designated as an independent contractor; (3) Northwestern Mutual did not mandate a set work schedule for plaintiff; (4) Northwestern Mutual did not supervise plaintiff's work; (5) plaintiff was not on Northwestern Mutual's payroll and did not receive fringe benefits from Northwestern Mutual; (6) plaintiff never met with anyone from Northwestern Mutual during his

1

relevant period of work; and (7) plaintiff did not have any relationship with NMIS.

In the face of these uncontroverted facts, plaintiff has adduced no evidence of Northwestern Mutual's involvement in plaintiff's work, other than marketing materials and internship training manuals that Northwestern Mutual supplied to other independent contractors who interacted with plaintiff. However, as a matter of law, such materials (which were not mandatory) do not establish an employment relationship because they do not demonstrate that Northwestern Mutual controlled plaintiff's work. Further, plaintiff has submitted evidence that non-defendants who were also independent contractors of Northwestern Mutual supervised him, but he has failed to set forth evidence from which any such supervision could be imputed to Northwestern Mutual. Accordingly, defendants are entitled to summary judgment because, even construing the evidence most favorably to plaintiff, no rational fact-finder could conclude that plaintiff was their employee. Since the Court holds that plaintiff was an independent contractor under New York law, it does not address defendants' outside salesperson claim.

I. BACKGROUND

A. Facts

The following facts are taken from the parties' depositions, affidavits, and exhibits, as well as their respective Rule 56.1 statements of fact ("Defs.' 56.1," ECF No. 49; "Pl.'s 56.1" and "Pl.'s 56.1 Counterstatement," ECF No. 54; and "Defs.' 56.1 Counterstatement Resp.," ECF No. 59). Unless otherwise noted, the facts are either undisputed or uncontroverted. Upon consideration of the motion for summary judgment, the Court shall construe the facts in the light most favorable to plaintiff as the nonmoving party and will resolve all factual ambiguities in his favor. *See Capobianco v. New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2001).

1. Defendants' Business

Defendant Northwestern Mutual is an insurance company headquartered in Milwaukee, Wisconsin whose core business is underwriting, issuing, and servicing insurance policies and annuities. (Defs.' 56.1 ¶¶ 1, 3.) Defendant NMIS is a subsidiary of Northwestern Mutual that provides brokerage and advisory services to individuals and businesses regarding securities and other registered products. (*Id.* ¶ 2.)

Northwestern Mutual does not directly solicit prospective customers to apply for its insurance products, and it does not hire any employees to sell its products. (*Id.* ¶¶ 4-5.) Instead, Northwestern Mutual exclusively markets its policies and annuities through a network of independent insurance agents who individually contract with "General Agents" to sell those products. (*Id.* ¶ 7.) General Agents are independent contractors who solicit applications from potential customers. (*Id.* ¶¶ 8-9.) They may also enter into separate agreements with "District Agents" and/or "Field Directors" to expand their agencies. (*Id.* ¶ 10.) Like General Agents, neither District Agents nor Field Directors are employees of Northwestern Mutual, but instead are licensed insurance agents who operate their own businesses. (*Id.* ¶ 11.) District Agents and Field Directors may in turn contract with Financial Representatives ("FRs" or "Agents"), including college students, and the agreements that FRs sign with General Agents, District Agents, and/or Field Directors provide that these individuals are independent contractors and not employees of the General Agent, District Agent, Field

Director, or Northwestern Mutual. (*Id.* ¶¶ 12-13; Pl.'s 56.1 ¶ 13.)

### a. Internship Program

Northwestern Mutual runs an internship program for college students and maintains a web site that allows interested students to submit applications to become FRs. (Pl.'s 56.1 Counterstatement ¶¶ 99-101, 170-72; Defs.' 56.1 Counterstatement Resp. ¶¶ 99-101, 170-72.) During the time period relevant to this case, Michael Van Grinsven was Northwestern Mutual's Internship Director and oversaw the development of Northwestern Mutual internship materials and branding. (Van Grinsven Dep. Tr., ECF No. 53-11, at 18-19; Pl.'s 56.1 Counterstatement ¶¶ 159-60; Defs.' 56.1 Counterstatement Resp. ¶¶ 159-60.) Van Grinsven testified that Northwestern Mutual produced materials that promoted the Company and the internship program, and "that describe[d] individuals that have interned and at graduation decided to become full-time representatives." (Van Grinsven Dep. Tr. at 20-21; Pl.'s 56.1 Counterstatement ¶¶ 161-62; Defs.' 56.1 Counterstatement Resp. ¶¶ 161-62.) Northwestern Mutual also maintained a database of the insurance policies sold by college FRs, and the Company's Internship Growth Consultant, an employee working under Van Grinsven, advised Northwestern Mutual agencies on "best practices" in recruiting and developing college students. (Pl.'s 56.1 Counterstatement ¶¶ 165-67; Defs.' 56.1 Counterstatement Resp. ¶¶ 165-67.)

Northwestern Mutual also used College Unit Directors ("CUDs") to manage the internship program, and CUDs received a stipend of $600 per month paid to them by agencies that were then partially reimbursed by Northwestern Mutual. (Pl.'s 56.1 Counterstatement ¶ 183; Defs.' 56.1 Counterstatement Resp. ¶ 183.) To receive the stipend, CUDs were required to e-mail tracking forms of college FRs' activity to Northwestern Mutual. (Pl.'s 56.1 Counterstatement ¶ 184; Defs.' 56.1 Counterstatement Resp. ¶ 184.)

Northwestern Mutual provided several booklets offering guidance to CUDs and college FRs. The first, entitled "Welcome to the College Unit Director Start-Up Program," included, *inter alia*, a sample tracking form for CUDs to monitor FR activity. (Decl. of James Emmet Murphy ("Murphy Decl."), ECF No. 53, Ex. R; Pl.'s 56.1 Counterstatement ¶ 185; Defs.' 56.1 Counterstatement Resp. ¶ 185.) In addition, the "Intern Leadership Guide" advised CUDs on how to develop college students. (Murphy Decl., Ex. S; Van Grinsven Dep. Tr. at 110; Pl.'s 56.1 Counterstatement ¶ 190; Defs.' 56.1 Counterstatement Resp. ¶ 190.) Among other things, it included information on the intern selection process. (Murphy Decl., Ex. S; Pl.'s 56.1 Counterstatement ¶ 191; Defs.' 56.1 Counterstatement Resp. ¶ 191.) Finally, "Your Internship, Your Career: A Guidebook to Success" advised college FRs on the structure of the internship program and on how to market insurance products successfully. (Murphy Decl., Ex. T; Pl.'s 56.1 Counterstatement ¶¶ 192-93; Defs.' 56.1 Counterstatement Resp. ¶¶ 192-93.)

### 2. Plaintiff's Relationship with Defendants

### a. The Contract

From approximately June 2010 to October 2010, plaintiff was licensed and appointed to sell Northwestern Mutual insurance products as a college FR. (Defs.'

56.1 ¶ 15; Pl.'s 56.1 ¶ 15.)[1] On June 16, 2010, plaintiff executed a "College Student Agent's Contract" (the "Contract") with Krystin Boylan, née Fischer ("Boylan"), a CUD in New York City.[2] (Defs.' 56.1 ¶ 16; Pl.'s 56.1 ¶ 16; Aff. of Christopher A. Parlo ("Parlo Aff."), ECF No. 51, Ex. 5.) Robert Seery, a General Agent in White Plains, New York and owner of The Seery Financial Group (the "Seery Agency"), and a representative of Northwestern Mutual subsequently endorsed the Contract. (Defs.' 56.1 ¶ 17; Pl.'s 56.1 ¶ 17; Parlo Aff., Ex. 5.) Both Boylan and the Seery Agency are independent contractors of Northwestern Mutual. (Boylan Dep. Tr., ECF No. 53-2, at 215; Seery Dep. Tr., ECF No. 53-4, at 29.)

Plaintiff applied for this position at a career fair where he filled out an application. (Pl.'s 56.1 Counterstatement ¶ 106; Defs.' 56.1 Counterstatement Resp. ¶ 106.)[3] The Contract expressly stated that plaintiff "shall be an independent contractor and nothing herein shall be construed to make [plaintiff] an employee" of Northwestern Mutual, Seery, or Boylan. (Parlo Aff., Ex. 5; Defs.' 56.1 ¶¶ 18, 22; Pl.'s 56.1 ¶ 22.) In addition, plaintiff's Contract application, dated May 7, 2010, stated that he understood that "as a Northwestern Mutual Financial Representative [he would] be an independent contractor and not an employee of either the Company, General Agent, District Agent, Field Director, College Unit Director or the First Party to [his] agent's contract." (Parlo Aff., Ex. 6; Defs.' 56.1 ¶ 23; Pl.'s 56.1 ¶ 23.) During his deposition, plaintiff testified that he knew that he was an independent contractor under the Contract, but did not understand what the term "independent contractor" meant and thought that he was an employee. (Pl.'s Dep. Tr. at 178-79; Defs.' 56.1 ¶ 24; Pl.'s 56.1 ¶ 24.)

The Contract prevented plaintiff from "waiv[ing] any forfeiture or [altering] or discharge[ing] or waiv[ing] any of the terms and conditions of any policy or contract," and it precluded plaintiff from doing "business for any other company which issues annuity contracts, or life insurance or disability income insurance policies," with limited exceptions. (Parlo Aff., Ex. 5; Pl.'s 56.1 Counterstatement ¶¶ 126, 136; Defs.' 56.1 Counterstatement Resp. ¶¶ 126, 136.) Similarly, the Contract Application stated that plaintiff "may NOT do business for any other life insurance company, except in connection with applications that have been declined by" Northwestern Mutual. (Parlo Aff., Ex. 6 (emphasis in original); Pl.'s 56.1 Counterstatement ¶ 135; Defs.' 56.1 Counterstatement Resp. ¶ 135.) The Contract Application also stated that plaintiff must "devote full time to selling for Northwestern

---

[1] Plaintiff worked in New York City from June 2010 through August 2010 and in Poughkeepsie, New York from September 2010 through October 25, 2010. (Pl.'s 56.1 ¶ 15.) Because the Poughkeepsie period was "fundamentally different" from his New York City experience, "[p]laintiff only seeks compensation for the time spent during his summer internship" in New York City. Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Br."), ECF No. 55, at 8 n.2. Accordingly, the Court will limit its analysis to facts pertaining to the June 2010 to August 2010 time frame.

[2] Boylan testified that, as a CUD, she communicated with Northwestern Mutual's home office regarding strategies to develop interns into "full-time agents" and traveled to the home office for training sessions. (Pl.'s 56.1 Counterstatement ¶¶ 103, 187-88; Defs.' 56.1 Counterstatement Resp. ¶¶ 103, 187-88.)

[3] Plaintiff testified that he "saw a banner that said Northwestern Mutual Internship Program" at the career fair (Pl.'s Dep. Tr., ECF No. 53-3, at 202; Pl.'s 56.1 Counterstatement ¶ 106), whereas defendants assert that plaintiff applied for an internship directly with the Seery Agency (Defs.' 56.1 Counterstatement ¶ 106).

Mutual[.]" (Parlo Aff., Ex. 6; Pl.'s 56.1 Counterstatement ¶ 134; Defs.' 56.1 Counterstatement Resp. ¶ 134.)

NMIS was neither a party to, nor an endorser of, the Contract. (Parlo Aff., Ex 5.) Plaintiff never obtained a license to sell NMIS products and testified that he could not recall ever receiving anything from, or meeting or interacting with, anyone at NMIS. (Pl.'s Dep. Tr. at 283; Defs.' 56.1 ¶ 30; Pl.'s 56.1 ¶ 30.)

### b. Compensation

Under the Contract, plaintiff received compensation on a commission basis, instead of a salary or an hourly wage, and a $100 weekly stipend paid for by the Seery Agency. (Parlo Aff., Exs. 5, 9; Defs.' 56.1 ¶¶ 31, 35; Pl.'s 56.1 ¶ 31).[4] The commissions represented a percentage of the first-year premium paid by customers for insurance products, and Northwestern Mutual never withheld any taxes or other payments from plaintiff's compensation. (Defs.' 56.1 ¶¶ 32-33; Pl.'s 56.1 ¶¶ 32-33.) Plaintiff testified that he was not promised any additional or guaranteed compensation other than the commissions on the insurance sales he made. (Pl.'s Dep. Tr. at 24-25; Defs.' 56.1 ¶ 38; Pl.'s 56.1 ¶ 38.)

Plaintiff did not receive health, life, or disability insurance benefits from Northwestern Mutual, and he did not participate in any retirement plan sponsored by Northwestern Mutual. (Defs.' 56.1 ¶ 76; Pl.'s 56.1 ¶ 76.) Northwestern Mutual also made no contributions to workers' compensation insurance, unemployment insurance, or Social Security for plaintiff. (Defs.' 56.1 ¶ 77; Pl.'s 56.1 ¶ 77.)

### c. Sale of Insurance Products

At the outset of his appointment period to sell Northwestern Mutual products, plaintiff attended a training session in White Plains, New York for approximately three weeks that was paid for by the Seery Agency and taught by an independent third-party company not affiliated with Northwestern Mutual. (Defs.' 56.1 ¶ 27; Pl.'s 56.1 ¶ 27; Pl.' 56.1 Counterstatement ¶ 110; Defs.' 56.1 Counterstatement Resp. ¶ 110.)[5] During training, plaintiff completed a document entitled "The Northwestern Mutual Financial Network Financial Representative Marketing Plan" that listed: (1) potential markets that he would target for insurance sales, including "Personal Contacts" and "Father's Business Contacts"; (2) what tools and strategies he would use to sell insurance products to individuals in these markets; (3) his own personal sales goals; and (4) how many

---

[4] Plaintiff asserts in a conclusory fashion that his commissions were paid by Northwestern Mutual, and not the Seery Agency. (Pl.'s 56.1 ¶ 35.) However, the commissions statement submitted as evidence by defendants indicates that the Seery Agency remunerated plaintiff, and plaintiff has submitted no evidence to contradict those statements. (*See* Parlo Aff., Ex. 9.) In addition, the Contract provides that Boylan "shall pay commissions to [plaintiff] at the rates, and subject to the regulations, set forth" in a schedule created by Northwestern Mutual. (Parlo Aff., Ex. 5.) Thus, this fact is uncontroverted.

[5] Plaintiff testified that he "believe[d] they [Northwestern Mutual] had a guy come in to teach us for about a week or so" during this training (Pl.'s Dep. Tr. at 204-06; Pl.'s Counterstatement ¶ 111), but defendants deny that a Northwestern Mutual representative provided any sort of orientation (Defs.' 56.1 Counterstatement Resp. ¶ 111). Moreover, plaintiff testified that he never met with anyone from Northwestern Mutual while he was working in White Plains, New York City, or Poughkeepsie. (Pl.'s Dep. Tr. at 279.) In any event, plaintiff did not state the basis for his belief that he received training from a Northwestern Mutual representative, and even assuming this unsubstantiated assertion is true, it has no impact on the Court's analysis for the reasons discussed *infra*.

5

policies he would have to sell to pay for his annual expenses. (Parlo Aff., Ex. 8; Defs.' 56.1 ¶ 43; Pl.'s 56.1 ¶ 43.) After this training was complete, plaintiff worked from the New York City office of, and later the Poughkeepsie office of, the Seery Agency. (Defs.' 56.1 ¶ 28; Pl.'s 56.1 ¶ 28.)

With respect to plaintiff's day-to-day activities, the Contract stated that plaintiff "shall be free to exercise his own judgment as to the persons from whom he will solicit Applications and the time, place and manner of solicitation." (Parlo Aff., Ex. 5; Defs.' 56.1 ¶ 56; Pl.'s 56.1 ¶ 56.) Plaintiff was not given a single lead or prospect to contact to sell insurance. (Defs.' 56.1 ¶ 40; Pl.'s 56.1 ¶ 40.) Instead, plaintiff sought out referrals through social media and often used Google to find individuals and companies to contact. (Defs.' 56.1 ¶¶ 47-48; Pl.'s 56.1 ¶¶ 47-48.) Plaintiff testified that he developed a "web of all [his] warm markets" to sell insurance products, including acquaintances of his family members, and that he "used everything from Northwestern Mutual, the tools and scripts they provided" to make calls to potential clients. (Pl.'s Dep. Tr. at 124, 214-15, 298-99; Defs.' 56.1 ¶¶ 41-42; Pl.'s 56.1 ¶¶ 41-42). Plaintiff set up appointments with prospective clients on his own schedule and traveled to meet them outside of the office. (Defs.' 56.1 ¶¶ 50, 68; Pl.'s 56.1 ¶¶ 50, 68.) Boylan testified that she was available to plaintiff and other college FRs to help them with products or clients, and that "college agents were encouraged to do joint work, which is essentially partnering with a more senior representative in client meetings." (Boylan Dep. Tr. at 54-55; Pl.'s 56.1 Counterstatement ¶ 150.) She said that such joint meetings were in the client's interest because college FRs "were between 18 and 21 years old without any experience, so we didn't want to have them meet with people and misrepresent products." (Boylan Dep. Tr. at 55; Pl.'s 56.1 Counterstatement ¶ 150.) However, Boylan never attended a joint meeting with plaintiff. (Boylan Dep. Tr. at 55.)

While plaintiff worked in the New York City office of the Seery Agency, he was provided with office supplies, a computer, and a workspace. (Pl.'s 56.1 Counterstatement ¶ 117; Defs.' 56.1 Counterstatement Resp. ¶ 117.) He also received an e-mail address with a Northwestern Mutual Financial network ("NMFN") domain name. (Boylan Dep. Tr. at 64; Pl.'s 56.1 Counterstatement ¶ 115; Defs.' 56.1 Counterstatement Resp. ¶ 115.)[6] The New York City office held daily meetings where college FRs shared the results of their client calls (or "dials") from the previous day. (Pl.'s 56.1 Counterstatement ¶¶ 144-45; Defs.' 56.1 Counterstatement Resp. ¶¶ 144-45.)[7]

Plaintiff did not have a minimum sales requirement, and neither plaintiff nor anyone affiliated with Northwestern Mutual recorded how many hours plaintiff spent soliciting clients or selling insurance policies. (Defs.' 56.1 ¶¶ 60, 70; Pl.'s 56.1 ¶¶ 60, 70.) Plaintiff testified that he "felt the pressure that [he] had to keep up pace" with calls to prospective clients, although "no one was watching over [his] shoulder" to verify the number of calls that he made. (Pl.'s Dep. Tr. at 189, 251; Defs.' 56.1 ¶ 46; Pl.'s 56.1 ¶ 46.) Plaintiff further testified that he did not report the

---

[6] NMFN was the marketing name for Northwestern Mutual at that time. (Boylan Dep. Tr. at 64.)

[7] The parties dispute whether these meetings were mandatory and how long they lasted. (Pl.'s 56.1 Counterstatement ¶¶ 144-46; Defs.' 56.1 Counterstatement Resp. ¶¶ 144-46.) In any event, even assuming they were mandatory, that fact does not impact the Court's analysis for the reasons discussed *infra*.

6

number of hours he worked and that no one was tracking his hours (Pl. Dep. Tr. at 236; Defs.' 56.1 ¶ 62), but during the summer of 2010, he "went in [to the New York office] every day Monday to Friday" except for two days of bereavement leave (Pl. Dep. Tr. at 161; Pl.'s 56.1 ¶ 62; Pl.'s 56.1 Counterstatement Resp. ¶ 141).[8] Boylan said during her deposition that college FPs were generally expected to work full-time, or thirty-five to forty hours per week. (Boylan Dep. Tr. at 65; Pl.'s 56.1 ¶ 62.)

No one ever disciplined plaintiff for failing to make a certain number of calls, for failing to set up a certain number of client appointments, or for any other aspect of his performance or strategy. (Defs.' 56.1 ¶ 53; Pl.'s 56.1 ¶ 53.) In addition, plaintiff never received a single performance evaluation or any other type of critique of his performance as an insurance agent. (Defs.' 56.1 ¶ 57; Pl.'s 56.1 ¶ 57.) Plaintiff also testified that he never met with anyone from Northwestern Mutual while he was working in White Plains, New York City, or Poughkeepsie. (Pl.'s Dep. Tr. at 279.)

    d. Termination

On October 25, 2010, plaintiff ended his relationship with Boylan, Seery, and Northwestern Mutual by executing a "Mutual Agreement of Contract Termination." (Parlo Aff., Ex. 7; Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.) Plaintiff decided to terminate the Contract to focus exclusively on his work for Belltower Books ("Belltower"), a textbook resale company. (Defs.' 56.1 ¶¶ 25, 75; Pl.'s 56.1 ¶¶ 25, 75.) Plaintiff had previously entered into an independent contractor arrangement with Belltower prior to signing the Contract, and he performed work for Belltower during the fall of 2010 while he was still appointed to sell Northwestern Mutual products. (Defs.' 56.1 ¶¶ 25, 73; Pl.'s 56.1 ¶¶ 25, 73.)

B. Procedural History

Defendants removed this action from New York State court on June 6, 2014 (ECF No. 1) and initially moved for summary judgment on April 6, 2015 (ECF No. 20). After the motion was fully submitted on June 3, 2015 (ECF No. 31), the Court held oral argument on November 16, 2015 (ECF No. 38).

Following argument, the Court held a telephone conference on December 2, 2015 to discuss plaintiff's request for additional discovery on plaintiff's relationship with Northwestern Mutual. (ECF No. 42.) The Court authorized supplemental discovery and, accordingly, denied defendants' first summary judgment motion with leave to renew.

After completion of supplemental discovery, defendants renewed their motion on July 22, 2016 (ECF No. 47), and plaintiff filed opposition papers on September 9, 2016 (ECF No. 53). Defendants filed their reply on October 7, 2016. (ECF No. 58.) The Court held oral argument on October 27, 2016 (ECF No. 63) and has carefully considered the parties' submissions.

---

[8] The parties dispute whether plaintiff was required to notify Boylan prior to taking any vacation days. Plaintiff asserts: "If an intern needed to take time off, they were required to notify the College Unit Director in advance." (Pl.'s 56.1 Counterstatement ¶ 148.) He points to a June 25, 2010 e-mail wherein he told Boylan, "I am going on vacation on the following dates: 7/31-8/4, and also 8/07-8/14" (Murphy Decl., Ex. E), though he did not ultimately take any leave (Pl.'s 56.1 Counterstatement ¶ 148). Defendants contend that the e-mail does not evince a notification requirement but was purely volitional on the part of plaintiff. (Defs.' 56.1 Counterstatement Resp. ¶ 148.) In any event, this disputed fact is not material to the Court's analysis.

7

## II. STANDARD OF REVIEW

The standard for summary judgment is well-settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). Rule 56(c)(1) provides that a

> party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## III. DISCUSSION

Defendants move for summary judgment on plaintiff's claims against Northwestern Mutual and argue that (1) plaintiff was an independent contractor, and not an employee, of Northwestern Mutual and thus exempt

from New York's minimum wage and overtime laws; or alternatively (2) even if plaintiff was an employee, he worked as an "outside salesperson" and was therefore also exempt. In addition, defendants argue that plaintiff has no cause of action against NMIS because there was no relationship between the parties.

For the reasons set for the below, the Court concludes that plaintiff was an independent contractor as a matter of law and, therefore, does not reach defendants' outside salesperson argument. In addition, the Court concludes that plaintiff performed no work for NMIS and, accordingly, grants defendants' motion for summary judgment in its entirety.

A. Plaintiff's Relationship with Northwestern Mutual

1. Legal Standard

The NYLL §§ 650 *et seq.* and Title 12 of the New York Compilation of Codes, Rules and Regulations, Section 142-2.2 obligate employers subject to those provisions to pay their employees a minimum wage and overtime pay for time exceeding forty hours per workweek. Section 663 of the NYLL creates a private right of action for employees to recover unpaid wages. N.Y. Lab. Law § 663.

The NYLL defines an employee as "any individual employed or permitted to work by an employer in any occupation . . . ." *Id.* § 651; *see also id.* at § 2 ("'Employee' means a mechanic, workingman or laborer working for another for hire."). Under New York law, "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results."

*Meyer v. U.S. Tennis Ass'n*, 607 F. App'x 121, 122 (2d Cir. 2015) (quoting *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003)); *see also Matter of O'Brien v. Spitzer*, 7 N.Y.3d 239, 242 (2006) ("Broadly speaking, an employee is someone who works for another subject to substantial control, not only over the results produced but also over the means used to produce the results. A person who works for another subject to less extensive control is an independent contractor."); *Goodwin v. Comcast Corp.*, 42 A.D.3d 322, 322 (1st Dep't 2007) ("Control of the method and means by which work is to be performed, therefore, is a critical factor in determining whether a party is an independent contractor or an employee . . . .").

"Factors relevant to assessing control include whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Bynog*, 1 N.Y.3d at 198. "These five factors, however, are not exhaustive," and courts also holistically assess an employer's supervision of the purported employee. *Marcus v. AXA Advisors, LLC*, 307 F.R.D. 83, 92 (E.D.N.Y. 2015) (citing *In re Hertz Corp.*, 2 N.Y.3d 733, 735 (2004)). In addition, the "fact that a contract exists designating a person as an independent contractor is to be considered, but is not dispositive." *Araneo v. Town Bd. for Town of Clarkstown*, 55 A.D.3d 516, 519 (2d Dep't 2008).

Under this framework, "the mere retention of general supervisory powers over an independent contractor" does not create an employment relationship. *Goodwin*, 42 A.D.3d at 323; *see also Murphy v. Guilford Mills, Inc.*, No. 02CIV10105LTSTHK, 2005 WL 957333, at *5 (S.D.N.Y. Apr. 22, 2005) (same). In other words, "[i]ncidental control over the results produced—without further

9

evidence of control over the means employed to achieve the results—will not constitute substantial evidence of an employer-employee relationship." *Hertz*, 2 N.Y.3d at 735.

2. Analysis

Drawing all factual inferences in plaintiff's favor, the Court proceeds to apply the *Bynog* factors and assess the degree of control exercised by Northwestern Mutual over plaintiff. As discussed below, plaintiff has no evidence—despite months of supplemental discovery—that Northwestern Mutual managed the "methods and means" of his work under the Contract such that a rational fact-finder could conclude that an employment relationship existed with Northwestern Mutual. In fact, the uncontroverted evidence clearly demonstrates that plaintiff was an independent contractor of Northwestern Mutual. Plaintiff has, at best, identified issues of material fact as to his relationship with the Seery Agency and Boylan, both of whom are independent contractors, and neither of whom are defendants in this action.

a. Factors 1 and 5: Work Schedule

Defendants argue that plaintiff determined when and whether to work during the summer of 2010, and that no one—including plaintiff—tracked his hours during this period. Mem. of Law in Supp. of Defs.' Renewed Mot. for Summ. J. ("Defs.' Br."), ECF No. 48, at 14-15. Plaintiff counters that he was required to "work a full-time schedule in the office, five days each week"; "attend a meeting with his College Unit Director [Boylan] every single morning"; and "notify the College Unit Director in advance if he planned to take time off." Pl.'s Br. at 14.

Drawing all inferences in plaintiff's favor, plaintiff has not adduced any facts demonstrating that *Northwestern Mutual* controlled plaintiff's conduct by deciding when and where he worked. Instead, plaintiff attempts to elide the distinction between Northwestern Mutual on the one hand and Boylan and the Seery Agency on the other by arguing that there is "uncontroverted evidence . . . that Rose was required to work 35 to 40 hours per week in [Northwestern Mutual's] New York City office . . . ." Pl.'s Br. at 4. However, it is undisputed that plaintiff worked in the offices of the *Seery Agency* during the summer of 2010 (Defs.' 56.1 ¶ 28; Pl.'s 56.1 ¶ 28), and that the Seery Agency was itself an independent contractor of Northwestern Mutual (Defs.' 56.1 ¶¶ 8-9; Pl.'s 56.1 ¶¶ 8-9; Seery Dep. Tr. at 29). Insofar as independent contractor Boylan testified that college FPs were generally expected to work thirty-five to forty hours per week (Boylan Dep. Tr. at 65; Pl.'s 56.1 ¶ 62), plaintiff has not imputed this expectation to Northwestern Mutual. Indeed, there are no facts showing that Northwestern Mutual mandated that college FPs work a certain number of hours or at a specified location. In any case, such a requirement would not necessarily establish an employment relationship. *See Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 602 (E.D.N.Y. 2012) ("Even independent contractors, although 'independent' in name, are required to keep to a schedule. The fact that an independent contractor is required to be at a job or at a facility at a certain time does not eliminate his status as an independent contractor." (citation omitted)).

Similarly, although the parties dispute whether plaintiff was in fact required to meet with Boylan daily and whether he was required to obtain her permission prior to taking vacation days, plaintiff has not established a nexus between Northwestern Mutual and these purported obligations. Further, regular company meetings are also insufficient to establish an employer-

employee relationship. *In re Empire State Towing & Recovery Ass'n, Inc.*, 15 N.Y.3d 433, 438 (2010) ("[T]he fact that O'Connell had to submit periodic reports and attend meetings 'is a condition just as readily required of an independent contractor as of an employee and not conclusive as to either.'" (quoting *Hertz*, 2 N.Y.3d at 735)); *Browning*, 885 F. Supp. 2d at 607 (holding "that the Plaintiffs were required to . . . attend monthly meetings [was] not dispositive and [did] not weigh against a finding of independent contractor status as a matter of law").

In short, the first and fifth *Bynog* factors favor defendants because plaintiff has failed to put forth any evidence that Northwestern Mutual dictated his work schedule.

b.  Factor 2: Other Employment

Defendants argue that, under the Contract, plaintiff was free to perform work for other companies, including competitors of Northwestern Mutual.[9] Defs.' Br. at 15. Plaintiff responds that the Contract's "exclusive dealing" requirement, as well as the Contract Application's statement that applicants must "devote full time to selling for Northwestern Mutual," prevented him from seeking other work. Pl.'s Br. at 14-15. He also argues that his full-time schedule constrained his employment opportunities. *Id*. However, as discussed *supra*, plaintiff has not shown that Northwestern Mutual, as opposed to Boylan or the Seery Agency, required him to work full-time.

The relevant Contract provision states that:

> Agent shall do no business for any other company which issues annuity contracts, or life insurance or disability income insurance policies, except in connection with Applications with respect to persons who are then insured by the Company to the limit which it will issue on them or who are otherwise not acceptable for insurance by the Company or who have been found by the Company to be insurable only at higher than standard premium rates which are unacceptable to the applicants.

(Parlo Aff., Ex. 5.) In other words, plaintiff could not sell competing annuity contracts, life insurance policies, or disability income insurance policies unless they offered lower premiums than Northwestern Mutual's products, or unless an applicant presented unacceptable risk to Northwestern Mutual or had reached an insurance limit. Defs.' Reply Br., ECF No. 58, at 7.

Other courts have found that an individual's ability to sell competing insurance products demonstrated that he was an independent contractor. *See Scott v. Massachusetts Mut. Life Ins. Co.*, 86 N.Y.2d 429, 433-34 (1995) (plaintiff was an independent contractor because, *inter alia*, she "could sell competitors' products"); *Sofranko v. Nw. Mut. Life Ins. Co.*, No. CIV.A. 2:06CV1657, 2008 WL 145509, at *4 (W.D. Pa. Jan. 14, 2008) (finding, in a Fair Labor Standards Act case, that Northwestern Mutual did not exert "significant control" over the plaintiff where the "contract provided that the plaintiff could sell insurance products of other insurance companies if NM did not offer the product desired, if NM had insured the client to its limit, if NM refused the risk of insuring the prospective policyholder, or if NM quoted

---

[9] Defendants note that plaintiff worked for Belltower in the fall of 2010 and terminated the Contract to focus on his efforts on that company's business. Defs.' Br. at 15. However, since plaintiff has cabined his claims to the June-August 2010 period, *see supra* note 1, this fact does not bear on the Court's analysis.

rates higher than standard premium rates" (footnoted omitted)).

Nevertheless, the Contract's "Exclusive Dealing" provision, while not absolute, did impose a constraint on plaintiff, and the Court, therefore, finds this factor to be neutral.

    c.  Factors 3 and 4: Fringe Benefits and Compensation

Plaintiff acknowledges that he did not receive any fringe benefits from Northwestern Mutual (Pl.'s Br. at 15; Defs.' 56.1 ¶¶ 76-77; Pl.'s 56.1 ¶¶ 76-77), but asserts that this fact is "unimportant" and relies on *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901 (S.D.N.Y. 2013), for that proposition. Pl.'s Br. at 15. In *Hart*, the district court determined that the plaintiffs were employees under the NYLL notwithstanding that they were free to pursue other employment, were not on the defendants' payroll, and did not receive any benefits. 967 F. Supp. 2d at 925-96. With respect to fringe benefits, the court said that "[t]o assign this factor much weight would effectively allow any employer to control, under New York law, a worker's status simply by labeling her an independent contractor and denying her employee benefits. But employee status under the NYLL turns on substance, not form." *Id*. at 925.

*Hart* accurately observes that no single *Bynog* factor is dispositive, and that an individual's formal title or position does not establish control. *See Araneo*, 55 A.D.3d at 519 (independent contractor designation is probative but not determinative). Nevertheless, New York courts and federal courts applying New York law routinely cite the absence of fringe benefits as evidence that no employment relationship exists. *See, e.g.,* *Lazo v. Mak's Trading Co.*, 84 N.Y.2d 896, 897 (1994); *Sanabria v. Aguero-Borges*, 117 A.D.3d 1024, 1025 (2d Dep't 2014); *Meyer*, 607 F. App'x at 123; *Velu v. Velocity Exp., Inc.*, 666 F. Supp. 2d 300, 308 (E.D.N.Y. 2009). Thus, irrespective of whether this factor deserves "much weight," the undisputed lack of fringe benefits in this case supports defendants' position that plaintiff was an independent contractor.

Similarly, plaintiff acknowledges that he did not receive an hourly wage, that his compensation was commission-based, and that Northwestern Mutual did not withhold taxes from his income. (Pl.'s Br. at 15; Parlo Aff., Exs. 5, 9; Defs.' 56.1 ¶¶ 31-32; Pl.'s 56.1 ¶¶ 31-32.) However, he asserts that he was on Northwestern Mutual's "payroll as he received a weekly $100 stipend, paid by Seery with funds obtained by Seery from Northwestern Mutual for services performed on behalf of Northwestern Mutual." (Pl.'s 56.1 ¶ 32.) Plaintiff does not offer any evidence to support his claim that the funds he received from the Seery Agency came from Northwestern Mutual, and the Contract states that Boylan was responsible for paying plaintiff's commissions. (Parlo Aff., Ex. 5.) Further, the commissions statement provided by defendants indicates that the Seery Agency remunerated plaintiff. (Parlo Aff., Ex. 9.)

In any case, even if the Seery Agency "obtained" funds from Northwestern Mutual to pay plaintiff's commissions and stipend, that would not establish that plaintiff was on Northwestern Mutual's payroll, but merely that the Seery Agency—itself an independent contractor—was paid by Northwestern Mutual for services rendered by college FRs. *See Bynog*, 1 N.Y.3d at 199 ("The Cipriani defendants would not pay any of the temporary waiters directly. Instead, they would send a check to MJA [a temporary

personnel agency], payable to MJA, to settle the accounts [pertaining to the waiters' services.]"); *see also id.* at 197 ("The Cipriani defendants never took deductions, including payroll taxes, from the amounts invoiced by MJA."); *Scott*, 86 N.Y.2d at 433 (insurance agent was an independent contractor because, *inter alia*, she "was paid by performance rather than a salary [and] did not have Federal, State or local taxes withheld from her pay").

Accordingly, the third and fourth *Bynog* factors favor defendants.

d. Other Indicia of Control

Beyond addressing the *Bynog* factors, courts must also assess the totality of a worker's relationship with a purported employer when determining whether an employment relationship existed. *See Hertz*, 2 N.Y.3d at 735; *Hart*, 967 F. Supp. 2d at 926; *Marcus* 307 F.R.D. at 92. Again, incidental or supervisory oversight are insufficient to demonstrate an employer-employee relationship. *Hertz*, 2 N.Y.3d at 735; *Goodwin*, 42 A.D.3d at 323.

Defendants argue that plaintiff's "entire connection to Northwestern Mutual was that he had signed a contract that authorized him, as an independent contractor, to sell its products," and that his "contract with Boylan expressly states, and numerous other documents confirmed, that he was an independent contractor, and not an employee of either Boylan, Seery or Northwestern Mutual." Defs.' Br. at 1-2. They also aver that plaintiff selected his own clients and met with them on his schedule, developed his own sales strategy, and "never individually met with, nor received any guidance, supervision, or performance evaluations from, anyone at Northwestern Mutual." *Id.* at 2. Finally, defendants argue that General Agents like the Seery Agency administered their own internship programs independent of Northwestern Mutual. *Id.* at 3.

Plaintiff contends that Northwestern Mutual, by virtue of maintaining an internship web site and publishing various guidebooks and training and marketing materials concerning its internship program, effectively controlled plaintiff's work under the Contract. Pl.'s Br. at 1-3. He also asserts that

> [w]hile working in NWM's New York City offices, Rose was required to attend mandatory meetings; had a quota for the number of calls he had to make each day to attract clients for NWM; had to use NWM's marketing materials; . . . and—most importantly—*could not make any sales on his own without a senior agent processing the transaction*.

*Id.* at 2 (emphasis in original). In support of that claim, plaintiff points to Boylan's testimony that college FRs were encouraged to partner with senior representatives during client meetings. *Id.* at 10-11. In addition, plaintiff argues that the Contract precluded him from modifying the terms or conditions of the Northwestern Mutual products that he sold, *id.* at 9; and that plaintiff was "directed to make cold calls for numerous hours, using language approved by NWM, pursuant to scripts promulgated by NWM," *id.* at 10.

All of plaintiff's arguments are meritless for the same reason: There are no facts demonstrating that Northwestern Mutual controlled his day-to-day activities. With respect to the various internship guidebooks, plaintiff has not shown that he ever received copies of those materials during the relevant time period. Further, those manuals merely offer precatory advice on how to be a successful intern. (*See, e.g.*, "Your Internship, Your Career: A Guidebook to

Success," Murphy Decl., Ex. T at 6 (recommending that interns "please follow this simple checklist to make sure that you are on the track to a successful internship experience" by, *inter alia*, "fill[ing] out contracting materials" and "attend[ing] intern sale school")). Plaintiff has not shown that he was obligated to follow those policies and did not offer any legal authority, either in his briefs or at oral argument, holding that promulgating general guidelines evinces an employment relationship. Similarly, he has not identified any decisions supporting the proposition that maintaining an internship program and web site is evidence of control where there are no facts demonstrating that the purported employer supervised the intern's daily activities. On the contrary, courts have held that training manuals and general work policies are merely evidence of incidental or supervisory oversight. *See, e.g.*, *Scott*, 86 N.Y.2d at 434 (defendant's guidelines regarding agent training reflected "only minimal control over plaintiff's own work"); *Toscarelli v. Purdy*, 217 A.D.2d 815, 817 (3d Dep't 1995) ("We are not persuaded that [defendant's] submission of its general policy guidelines competently supported a finding that such control existed."); *Sofranko*, 2008 WL 145509, at *5 ("With respect to the manuals, NM argues that the plaintiff has presented no facts to show that he received the manuals, acted in accordance with them, was disciplined for failing to comport with them, or received any directive from NM with respect to them."); *Waite v. Am. Airlines, Inc.*, 73 F. Supp. 2d 349, 356 (S.D.N.Y. 1999) (holding that "an employer's providing its contractor with guidelines is not equivalent to the employer exerting supervision or control over the performance of the contractor's work or its employees").

As for plaintiff's claims concerning cold calls and joint meetings, the testimony that he cites does not demonstrate that such conduct was mandatory, and in any case, plaintiff has again not shown that *Northwestern Mutual* imposed any obligations. With respect to the scripts that plaintiff used for client calls and his contractual obligation not to modify the terms or conditions of Northwestern Mutual's insurance products, such facts again only establish incidental supervisory management. Defining the contours of an independent contractor's work and providing general direction does not transform him into an employee. *See Beach v. Velzy*, 238 N.Y. 100, 104 (1924) ("That appellant gave some directions, not as to method or means of doing the work, but as to the work to be done, does not change the relation of the parties. He did little more than to furnish some verbal specifications for the roofing, leaving to claimant control over the time, method, and means of doing the work."); *Sofranko*, 2008 WL 145509, at *5 (W.D. Pa. Jan. 14, 2008) (use of Northwestern Mutual's advertising materials did not make him an employee). It is hardly surprising that a company would forbid its contractors from modifying the products they sold on its behalf, and plaintiff's testimony that he used Northwestern Mutual's scripts does not establish that such use was mandatory. Further, plaintiff's other testimony that he developed his own "warm markets" and determined which clients to meet with and when demonstrate that plaintiff was highly independent vis-à-vis managing his relationships with potential clients. (Pl.'s Dep. Tr. at 124, 214-15, 298-99; Defs.' 56.1 ¶¶ 41-42, 50, 68; Pl.'s 56.1 ¶¶ 41-42, 50, 68.)

The cases that plaintiff relies on in support of his control claim—*Hernandez v. Chefs Diet Delivery, LLC*, 81 A.D.3d 596 (2d Dep't 2011) and *Murphy v. ERA United Realty*, 251 A.D.2d 469 (2d Dep't 1998)—in fact strike a stark and unfavorable juxtaposition for him. In *Hernandez*,

the plaintiffs alleged that the defendants, among other things, provided daily delivery manifests directing the drivers as to where deliveries were to be made, reimbursed the drivers for mileage, and required the plaintiffs to attend mandatory meetings, to obtain approval for vacation time, to undergo approximately one to two weeks of training, and to refrain from playing loud music while making deliveries.

81 A.D.3d at 598. In *Murphy*, the plaintiff's contract required her to

(1) work at least 40 hours per week; (2) answer the company telephones; (3) wear the company uniform; (4) follow company procedures; (5) use company forms; (6) attend mandatory sales meetings; (7) attend training meetings on a regular basis; (8) sign in and out of the office; and (9) coordinate vacation time with the supervising broker.

251 A.D.2d at 470-71. Plaintiff argues that defendants

exercised similar control by requiring Rose to work a full-time schedule of at least 35 to 40 hours each week, mandating attendance at daily meetings, providing daily instructions regarding telephone dials and scripts, requiring interns to undergo initial training and participate in developmental meetings, requiring approval of vacation time and covering costs for office space and supplies.

Pl.'s Br. at 16.

However, as discussed above, plaintiff has failed to adduce any facts showing that Northwestern Mutual, rather than Boylan or the Seery Agency, imposed most of these ostensible obligations on plaintiff, and the use of call scripts indicates, at most, passive oversight. Thus, unlike *Hernandez* and *Murphy*, where the employers exerted marked management of the plaintiffs' work, the instant cases parallels *Sofranko*, where the court held that Northwestern Mutual did not control a plaintiff who worked for another independent contractor. There,

the plaintiff was not a party to a contract with NM; rather, he was recruited, contracted with, and trained by Kevin Miller and/or Charles Ferrara, and he worked in Ferrara's offices. NM does not control Ferrara or his day-to-day operations. Indeed, Ferrara is independent of NM, and NM has no ownership interest in Ferrara. NM did not assign the plaintiff to work in Ferrara's offices, and it did not exercise control over his day-to-day business or his work schedule.

2008 WL 145509, at *5 (footnotes omitted). Similarly, Rose signed a contract with Boylan that designated him as an independent contractor—evidence that no employment relationship existed, *see Araneo*, 55 A.D.3d at 519—and he admitted during his deposition that he never met with anyone from Northwestern Mutual while he was working in the Seery Agency's White Plains, New York City, or Poughkeepsie offices (Pl.'s Dep. Tr. at 279).

The Court's conclusion in this case is not only consistent with *Sofranko*, but also with numerous other courts that have similarly concluded, on summary judgment, that Northwestern Mutual insurance agents are

independent contractors, and not employees. *See, e.g.*, *Weary v. Cochran*, 377 F.3d 522, 528 (6th Cir. 2004) (affirming grant of summary judgment); *Holden v. Nw. Mut. Fin. Network*, No. 07-C-0930, 2009 WL 440937, at *7 (E.D. Wis. Feb. 23, 2009); *Nixon v. Nw. Mut. Life Ins. Co.*, 58 F. Supp. 2d 1269, 1275 (D. Kan. 1999); *Bogan v. Nw. Mut. Life Ins. Co.*, 200 A.D.2d 650, 651 (2d Dep't 1994); *Pierce v. Nw. Mut. Life Ins. Co.*, 444 F. Supp. 1098, 1104 (D.S.C. 1978). Although plaintiff argues that these decisions are distinguishable because they "pertain to experienced financial service representatives, rather than college-student 'interns,'" Pl.'s Br. at 18, plaintiff's work, as discussed above, was functionally equivalent to that of any other independent insurance agent, and "employee status under the NYLL turns on substance, not form," *Hart*, 967 F. Supp. 2d at 925.

In sum, plaintiff has not set forth any facts demonstrating that he was a Northwestern Mutual employee. After this Court held oral argument in November 2015 on defendants' original summary judgment motion, it afforded plaintiff an opportunity through supplemental discovery to demonstrate that Northwestern Mutual, rather than Boylan or the Seery Agency, managed his work under the Contract. One year later, plaintiff has presented evidence that Northwestern Mutual maintained an internship program and published general training manuals and guidebooks offering college interns tips for success. However, there are no facts showing that (1) plaintiff ever received the guidebooks; or (2) the advice therein was in fact binding. In any event, the uncontroverted facts demonstrate that no rational juror could find, under the *Bynog* framework, that plaintiff had an employment relationship with Northwestern Mutual. Plaintiff's other allegations at best create genuine issues of material fact as to his relationship with the Seery Agency and Boylan, both of whom are independent contractors, and neither of whom are defendants in this action. Because plaintiff has not shown anything beyond incidental or supervisory oversight on the part of Northwestern Mutual, the Court concludes that he was an independent contractor as a matter of law and, accordingly, has no cause of action for minimum wage or overtime violations under the NYLL.

B. Plaintiff's Relationship with NMIS

Plaintiff does not oppose defendants' motion for summary judgment as to NMIS, and the record shows that NMIS was not a party to the Contract, and that plaintiff never obtained a license to sell NMIS products or interacted with anyone at NMIS. (Parlo Aff., Ex 5.; Pl.'s Dep. Tr. at 283; Defs.' 56.1 ¶ 30; Pl.'s 56.1 ¶ 30.) Therefore, plaintiff also has no claim against NMIS.

IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment in its entirety and dismisses all of plaintiff's claims. The Clerk of Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:  December 12, 2016
        Central Islip, NY

\*\*\*

Plaintiff is represented by James E. Murphy and Susanne Leeds Klein of Virginia & Ambinder LLP, 40 Broad Street, 7th Floor, New York, NY 10004; and Jeffrey K. Brown

and Michael Alexander Tompkins of Leeds Brown Law, P.C., One Old Country Road, Suite 347, Carle Place, New York 11514. Defendants are represented by Christopher A. Parlo of Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178.